On September 1, 1995, the appellant, Corey Schirod Smith, was convicted of the capital offense of capital murder for the killing of Kimberly Ann Brooks. The murder was made capital because he committed it during the course of a kidnapping.See § 13A-5-40 (a)(1), Ala. Code 1975. The jury unanimously recommended that he be sentenced to death. On September 14, 1995, the trial court followed the jury's recommendation and sentenced him to death. We affirmed his conviction on direct appeal, see Smith v. State,797 So.2d 503 (Ala.Crim.App. 2000); the Alabama Supreme Court denied his petition for a writ of certiorari, see Ex parteSmith, 797 So.2d 549 (Ala. 2001); and the United States Supreme Court denied his petition for a writ of certiorari,see Smith v. Alabama, 534 U.S. 962, 122 S.Ct. 371, 151 L.Ed.2d 282 (2001). This court issued a certificate of judgment on May 11, 2001.
On June 7, 2002, the appellant filed a Rule 32 petition, challenging his conviction. On September 19, 2002, he filed a First Amended Petition.[1] After the State responded, the circuit court conducted an evidentiary hearing and denied the petition. This appeal followed. *Page 918 
On direct appeal, this court summarized the facts of the case as follows:
 "The State's evidence tended to show the following. On February 24, 1995, Tallapoosa police discovered the charred body of Kimberly Brooks rolled in a carpet; the carpet was lying beside a dirt road in Bibb Town. The coroner testified that Brooks had been shot in the head and the stomach and that there was soot in her lungs and trachea; he testified that she died of the `shots to the head [and] the chest and possible asphyxiation and burning.'
 "Smith handwrote the following confession for the police:
 "`Kim came to the house around 7:30 a.m. Wednesday morning with Labreasha Main. We was talking about getting married later on. My brother Reginald came and Main left. After awhile, Reginald left.
 "`When my mamma got off work, me and Kim got into an argument about another girl calling me. We went outside. I pulled my gun on her. Sanjay [Brooks] and Shontai [Smith] pulled up. I forced her into the van. I told Sanjay to go to Bibb Town, which he did. And, when we got there, Kim and I got out, continuing arguing.
 "`I told her I love her, and if I couldn't have her, no one could. She told me she loved me but things weren't the same. I kissed her on the forehead and pushed her off me and shot her in the chest. And then she fell to the ground, and I shot her again toward her head.
 "`Shontai got out and helped me drag her into the bushes. We left. Sanjay dropped us off into the soft sands. When he returned, we got James Shealey['s] car and got some gas and went back where I left her.
 When we got there, she was standing up, and she got in the car and sat besides me. I was scared.
 "`Sanjay rode from Bibb Town to Reeltown looking for a place to set her on fire and bury her. I asked her what would she say if I took her to the hospital. She say, "I'm going to say Corey shot me." We returned back to Bibb Town, and Sanjay drop us off — dropped us off. He told us to go ahead and finish her and he'll be back.
 "`We put a trash bag over her face until she died. I poured the gas on her, and Shontai lit the lighter. Sanjay never returned.
 "`We left there and walked back to my house. Shontai spent the night. The next [day] he left and I never saw him again.'
 "Smith's codefendants, Sanjay Brooks and Shontai Smith, Smith's cousins, pleaded guilty to murder and to kidnapping and received life sentences in exchange for their trial testimony against Smith. Brooks was. sentenced to concurrent life sentences on each count and Shontai Smith was sentenced to two consecutive life sentences. Both codefendants testified at trial and corroborated Smith's statement. Shontai Smith further testified, concerning setting Brooks's body on fire, that after he and Smith poured gasoline on Brooks and ignited her, the fire got out of control; to stop it they threw sand on Brooks's body. The two then placed her body in a piece of carpet that had been left in the dump area and rolled her body in the carpet.
 "Two other witnesses testified that on the day of the murder Smith told them that he had killed Kimberly. One witness, Larry Butler, testified that Smith told him that he had killed Kimberly and *Page 919 
that he needed gasoline to dispose of her body."
Smith, 797 So.2d at 509-10.
The appellant argues that the circuit court abused its discretion in striking his Second Amended Petition. Regarding amendments to Rule 32 petitions, Rule 32.7(b), Ala. R.Crim. P., provides: "Amendments to pleadings may be permitted at any stage of the proceedings prior to the entry of judgment." Also, Rule 32.7(d), Ala. R.Crim. P., provides, in pertinent part: "Leave to amend shall be freely granted."
In Ex parte Rhone, 900 So.2d 455, 459 (Ala. 2004), the Alabama Supreme Court held:
 "The right to amend is limited by the trial court's discretion to refuse an amendment based upon factors such as undue delay or undue prejudice to the opposing party. That limitation is, in this Court's opinion, sufficient to protect the rights of the parties, while allowing the trial court sufficient control over the management of its docket."
Subsequently, in Ex parte Jenkins, [Ms. 1031313, April 8, 2005] __ So.2d ___, ____(Ala. 2005), the Alabama Supreme Court explained:
 "As we held in Ex parte Rhone, . . . a petitioner does not have the unfettered right to file endless amendments to a Rule 32 petition. The right to amend is limited by the trial court's discretion to refuse to allow an amendment if the trial court finds that the petitioner has unduly delayed filing the amendment or that an amendment unduly prejudices the State. Such an exercise of the trial court's discretion would certainly be appropriate, for example, if, on the eve of an evidentiary hearing, a Rule 32 petitioner filed an amendment that included new claims of which the State had no prior notice and as to which it was not prepared to defend.
 "We emphasize that the concepts of `undue delay' and `undue prejudice' as discussed in this opinion and in Ex parte Rhone apply to the trial court's management of its docket and to the petitioner's attention to his or her case. Those concepts cannot be applied to restrict the petitioner's right to file an amendment clearly provided for in Rule 32.7 simply because it states a new claim that was not included in the original petition."
Finally, in Ex parte Woods, 957 So.2d 533, 534-37
(Ala. 2006), the Alabama Supreme Court applied its holdings inRhone and Jenkins as follows:
 "On July 26, 2002, Woods filed a petition for postconviction relief, pursuant to Rule 32, Ala. R.Crim. P. On September 27, 2002, the State responded. On November 16, 2002, Woods filed an amended petition. On December 19, 2002, the circuit court conducted a status conference to narrow the issues presented by Woods's petition and to identify any claims that should be precluded. At the close of the conference, the circuit court ordered both parties to submit proposed orders by January 31, 2003. On January 24, 2003, instead of filing a proposed order as directed by the circuit court, Woods filed a second amended petition. On January 28, 2003, the State objected to Woods's second amendment, arguing:
 "`This second amended petition is 81 pages longer than Woods's first amended petition. In addition, the section numbers, page numbers and paragraph numbers in Woods's second amended petition are completely different than those in his first amended petition. Requiring the State to change its proposed order to correspond to Woods's second amended petition *Page 920 
at this late date would work a tremendous hardship on the State's counsel'
 "On January 30, 2003, the circuit court struck Woods's second amended petition. On February 7, 2003, the State filed its proposed order, which summarily dismissed all of Woods's claims. On February 11, 2003, Woods moved the court to reconsider its order striking his second amended petition. On February 20, 2003, Woods filed his proposed order. On July 2, 2003, a little less than a year after Woods filed his Rule 32 petition, the circuit court, adopting the State's order in its entirety, summarily dismissed the petition.
 "Woods appealed the summary dismissal of his petition to the Court of Criminal Appeals. In his brief to the Court of Criminal Appeals, Woods contended that the circuit court exceeded the scope of its discretion in striking his second amended petition. On August 27, 2004, the Court of Criminal Appeals, applying the reasoning and holding in Coral v. State, 900 So.2d 1274
(Ala.Crim.App. 2004), which cites McWilliams v. State, 897 So.2d 437 (Ala.Crim.App. 2004), and Rhone v. State, 900 So.2d 443
(Ala.Crim.App. 2004), held that the circuit court did not exceed its discretion in striking Woods's second amended petition. Recognizing that the second amended petition was not based on surprise, newly discovered evidence, or changed circumstance, the Court of Criminal Appeals held that the circuit court did not err in striking Woods's second amended petition, and it affirmed the circuit court's dismissal of Woods's Rule 32 petition. Woods v. State, 957 So.2d 492 (Ala.Crim.App. 2004).
 "Woods filed a petition for a writ of certiorari in this Court on December 3, 2004. On June 22, 2006, this Court issued the writ to determine, among other-matters, whether the circuit court exceeded the scope of its discretion by striking Woods's second amended petition.
 ". . . .
 "In its brief to this Court, the State admits that when this Court's holding in Ex parte Rhone and its progeny is applied to the facts of this case, the circuit court exceeded the scope of its discretion in striking Woods's second amended petition, and it requests that we remand the cause. We agree. The facts of this case do not establish that the circuit court's consideration of Woods's second amended petition would give rise to actual prejudice to the State or cause undue delay. Therefore, the circuit court exceeded its discretion in striking Woods's second amended petition, and a remand to the circuit court is proper to allow that court to consider Woods's second amended petition."
The following dates and events are relevant to an understanding of the issue in this case:
 June 7, 2002 The appellant filed his Rule 32 petition, which included an assertion that his trial counsel rendered ineffective assistance because they did not investigate and present mitigating evidence regarding his mental health problems.
 August 22, 2002 The State filed its answer to the appellant's petition.
 September 19, 2002 The appellant filed his First Amended Rule 32 Petition. In the petition, he listed his alleged mental health problems and included an affidavit from Dr. Michael S. Maher regarding his mental health problems.
 September 25, 2002 The State filed a "Motion to Set a Deadline for Amendments to Rule 32 Petition." *Page 921 
 October 8, 2002 The appellant filed a "Petitioner's Response to Respondent's Motion to Set a Deadline for Amendments to Rule 32 Petition."
 October 17, 2002 The State filed its answer to the appellant's First Amended Petition.
 October 29, 2002 The State filed a "State's Reply to Smith's Opposition to the Motion to Set a Deadline for Amendments to Rule 32 Petition." In its response, the State conceded that, "[e]ven with a deadline for filing further amendments, the State is not contending that there are no circumstances in which an amendment could not be filed. Clearly, if after the expiration of an amendment deadline, Smith demonstrates to this Court that he has discovered . . . a facially meritorious claim that could not have been, with diligence, included in his Rule 32 petition before the expiration of the deadline, he may move this Court for leave to amend his Rule 32 petition." (C.R. 207-08.)
 November 15, 2002 The circuit court set a deadline of December 31, 2002, for amendments to the petition. However, it noted that that ruling was "conditioned . . . upon the Court's reservation of consideration for further proposed amendment, only upon showing of good cause with evidentiary basis." (C.R. 210.) It also scheduled an evidentiary hearing for January 22, 2003.
 November 19, 2002 The State filed a motion to continue the evidentiary hearing due to military obligations of the State's counsel.
 November 26, 2002 The circuit court rescheduled the evidentiary hearing for March 25, 2003.
 January 7, 2003 The State filed a motion to continue the evidentiary hearing due to military obligations of the State's counsel.
 January 24, 2003 The circuit court rescheduled the evidentiary hearing for June 17, 2003.
 April 3, 2003 The appellant filed a motion to continue the evidentiary hearing so his experts would have time to investigate and prepare to present evidence concerning his ineffective-assistance claims.
 April 23, 2003 The circuit court rescheduled the evidentiary hearing for September 30, 2003.
 September 2, 2003 The appellant filed a motion to continue the evidentiary hearing so his experts could conduct additional investigation and testing. September 12, 2003 The parties filed a stipulation to continue the evidentiary hearing until November 24, 2003, or January 13, 2004.
 September 17, 2003 The circuit court rescheduled the evidentiary hearing for November 26, 2003, or January 2004.
 July 8, 2004 The State filed a "Motion. for a Prehearing Conference."
 July 19, 2004 The appellant filed a "Response to Motion for a Prehearing Conference and Motion for Reciprocal Discovery."
 September 13, 2004 The State filed a "Request for Discovery of Expert Witness Data."
 February 1, 2005 The State filed a "Motion for Access to Smith in Order to Conduct a Mental Health Evaluation."
 February 1, 2005 The State filed a "State of Alabama's Motion for Disclosure of Witnesses and Exhibits Smith Intends to Introduce at the Evidentiary Hearing." In that motion, the State asserted: "The bulk of the claims in Smith's amended Rule 32 *Page 922 
petition involve allegations of ineffective assistance of counsel. Many of these claims involve Smith's allegation that he suffers from assorted mental health disorders. In order to properly prepare for and possibly rebut any allegation of a mental health disorder offered by Smith's counsel, it is necessary for the State's mental health expert to have access to the petitioner for the purpose of conducting interviews and tests." (C.R. 252-53.)
 March 16, 2005 The circuit court ordered that Dr. Michael Maher and Ms. Marjorie Hammock give the following documents to defense counsel and that defense counsel then forward them to counsel for the State within fourteen days: "any test response sheets, score sheets, questionnaires, reports of examinations or tests, medical reports, or other similar documents taken pursuant to the examination of the petitioner or that he/she has reviewed and will rely on in formulating an opinion in this matter." (C.R. 259.)
 March 16, 2005 The circuit court ordered that Dr. Charles Golden give the following documents to defense counsel and that defense counsel then forward them to counsel for the State within ten days: "any test response sheets, score sheets, questionnaires, reports of examinations or tests, medical reports, or other similar documents taken pursuant to his examination of Mr. Smith that he has reviewed and will rely on in formulating an opinion in this matter." (C.R. 260.) The circuit court also ordered the State to provide to the defense "any similar data that mental health experts retained by Respondent review and rely on in formulating an opinion in this matter." (C.R. 260.)
 March 16, 2005 The circuit court granted the State's "Motion for Access to Smith in Order to Conduct a Mental Health Evaluation."
 April 1, 2005 The circuit court scheduled an evidentiary hearing for July 25, 2005, and ordered the parties to submit briefs setting forth the issues to be considered at least fourteen days before the evidentiary hearing.
 June 20, 2005 The circuit court conducted a conference telephone call with counsel for the appellant and the State.
 June 21, 2005 The circuit court ordered that counsel for both parties produce "any notes, records, reports, documents, statements, or other investigative material reviewed, utilized, or created by any expert witness to be called at the hearing on the Rule 32 Petition, which relate to this case, and any and all material or information that any expert relied upon in making or forming an opinion. This material shall include the name, address, and current telephone number of any person who provided information contained therein." (C.R. 266.)
 June 28, 2005 The circuit court ordered that the appellant produce to the State 1) test scores for tests Dr. Charles Golden administered during his evaluation of the appellant by June 22, 2005; 2) a, copy of exhibits to be admitted during the evidentiary hearing by July 1, 2005; and 3) a list of potential witnesses for the evidentiary hearing by July 1, 2005. It also ordered the State to produce to the appellant 1) a copy of exhibits to be admitted during the evidentiary hearing by July 8, 2005; 2) a list of potential witnesses for the evidentiary hearing by July 8, 2005; 3) a summary of Dr. Glen King's opinion concerning his *Page 923 
evaluation of the appellant by June 22, 2005. Finally, the circuit court ordered that the parties could depose experts who might testify during the evidentiary hearing.
 July 12, 2005 The State filed its witness and exhibit list.
 July 12, 2005 The State filed a "Respondent's Memorandum Brief Concerning Issues to Be Considered by the Court at the Rule 32 Evidentiary Hearing." Regarding the appellant's background, the State complained that the defense did not provide notes of Marjorie Hammock's interviews with the appellant's family members and friends until late June and early July 2005; that the appellant had not included any allegations about his background in his original petition or first amended petition; that the appellant had not previously named any witness who would testify about any of these matters; that the information had been available to the defense for some time[2]; and that the State did not have any prior notice about the appellant's background until Hammock's notes were produced. Regarding the appellant's mental health, the State com. plained that Dr. Michael Maher is the only expert identified in the petition; that, in his affidavit in support of the first amended petition, Maher had concluded only that the appellant suffered from Post 1'raumatic Stress Disorder and Poly Substance Abuse; that, during a deposition on July 8, 2005, Maher concluded that the appellant suffered from frontal and temporal lobe impairment, brain damage, and a mood disorder, but that he had not included such conclusions in his affidavit; that Maher should not be allowed to testify to any diagnosis that had not been specified in the petition or first amended petition; that no other expert had been identified in the petition or first amended petition; and that the defense should not be allowed to elicit any other expert's testimony during the evidentiary hearing.[3]
 July 18, 2005 The defense filed "Petitioner, Corey Smith's, Response to Claim for Dismissal Contained in Respondent's Memorandum Brief, and in the Alternative Motion to Amend First Amended Rule 32 Petition." In that response, the defense argued that, during a telephone conference in July 2004, the circuit court had granted the State the ability to depose all of the defense's experts, including Maher, Golden, and Hammock; that the defense had provided a summary of the testimony of Maher, Golden, and Hammock to the State on August 13, 2004; that the State had informed the defense that it did "`not feel the need to push for any further disclosure (depositions) other than the witness summary you provided'" on August 24, 2004; that the defense had provided all materials from experts to the State in June 2005; that the State again declined to depose Golden and Hammock; that the State hired Dr. *Page 924 
Glen King to conduct aneuropsychological evaluation of the appellant that was similar to the one Golden had conducted; that the State had known the appellant's claims, the identity of the appellant's experts, and the opinions of the appellant's experts for one year; and that the State had not articulated any prejudice, inability to proceed, or lack of notice of the witnesses' opinions. If the circuit court did not deny the State's motion to dismiss, the defense requested that it be allowed to amend the petition to include the facts the State contended were missing from the petition. In support thereof, it argued that the circuit court had indicated that it would consider allowing further amendment upon a showing of good cause; that good cause existed; that it was not making any new claims; that the State had known about the additional witnesses and their opinions for one year and had had the opportunity to depose them, but it had chosen not to; and that it sought permission to make substantive changes to only one paragraph of the petition.
 July 18, 2005 The defense filed a "Second Amended Petition for Relief from Conviction and Sentence Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure."
 July 20, 2005 The State filed an "Objection to and Motion to Strike Petitioner's Second Amended Petition for Relief from Judgement Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure." In support of its pleading, the State argued that there was undue delay because the defense filed the amended petition only seven days before the scheduled evidentiary hearing even though it had known the information at least as early as August 13, 2004. It also argued that it was unduly prejudiced because it could not file an answer and could not be prepared to argue or rebut the new factual allegations.
 July 21, 2005 The circuit court held a hearing on the State's motion to limit Maher's testimony and to exclude Golden's and Hammock's testimony.
 July 22, 2005 The circuit court granted the State's motion to limit Maher's testimony to the information that was set forth in his affidavit that was attached to the First Amended Petition and to exclude Golden's and Hammock's testimony.
 July 25, 2005 The defense filed a "Motion to Preclude All Testimony of Dr. Glen King."
 July 25, 2005 The circuit court denied the appellant's motion to amend the First Amended Petition.
 July 25-26, 2005 The circuit court conducted an evidentiary hearing.
 March 3, 2006 The circuit court entered an order denying the petition.
The appellant argues that consideration of the Second Amended Petition would not have caused prejudice to the State or undue delay. Specifically, he contends that the State had been on notice of his experts' testimony regarding his mental health for nearly one year and that it had retained its own mental health expert and was fully prepared to defend against his claims. The State argues that it would have been prejudiced by consideration of the Second Amended Petition because it "did not know of [the] newly alleged facts until late June and early July of 2005, just weeks prior to the evidentiary hearing." (State's brief at p. 18.) With regard to undue delay, the State argues:
 "[T]he undue delay analysis must focus on the [circuit] court's exercise of its discretion to manage its docket. For *Page 925 
example, in this case the [circuit] court was not required to accept a proposed amendment where it was very unlikely that the State — which was trying to prepare for an evidentiary hearing in seven days — would have been able to divert its attention and resources to the drafting of a responsive pleading. This short time period for filing a responsive pleading could have created yet another need for a continuance of the evidentiary hearing which had already been continued numerous times."
(State's brief at p. 13 n. 1.)
In this case, the only substantive differences between the First Amended Petition and the Second Amended Petition were in paragraph 105. Paragraph 105 of the First Amended Petition included the following allegations:
 "Most importantly, Corey Smith is and was, at the time of the crime, suffering from Post-Traumatic Stress disorder, Chronic, Severe, associated with abuse and neglect during childhood, and, independently, Poly-Substance Abuse, including alcohol, marijuana and crack cocaine. See, Expert Affidavit of Dr. Michael S. Maher, M.D., attached hereto as Exhibit `B'. Moreover, `[a]s a consequence of each of these diagnoses independently and certainly in combination, Mr. Smith's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law was substantially impaired. Further, the capital offense was committed while Mr. Smith was under the influence of extreme mental and emotional disturbance.' Id. No such expert evidence was presented at Mr. Smith's sentencing hearing and no reason exists, other than counsels' ineffectiveness, for failing to do so."
(C.R. 153.) Paragraph 105 of the Second Amended Petition included the following allegations:
 "A. Most importantly, Corey Smith is and was, at the time of the crime, suffering from Post-Traumatic Stress disorder, Chronic, Severe, associated with abuse and neglect during childhood, and, independently, Poly-Substance Abuse, including alcohol, marijuana and crack cocaine, frontal and temporal lobe impairment, brain damage and a mood disorder. See, Expert Affidavit of Dr. Michael S. Maher, M.D., attached hereto as Exhibit `B', and Deposition of Dr. Maher dated July 8, 2005, attached hereto as Exhibit B.1. Moreover, `[a]s a consequence of each of these diagnoses independently and certainly in combination, Mr. Smith's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law was substantially impaired. Further, the capital offense was committed while Mr. Smith was under the influence of extreme mental and emotional disturbance.' Id. No such expert evidence was presented at Mr. Smith's sentencing hearing and no reason exists, other than counsels' ineffectiveness, for failing to do so.
 ". . . B. Corey Smith's brain impairment, at the time of the offense, included significant cognitive problems, including difficulty with higher, or executive functioning, that influenced his ability to make judgments and conform his behavior to the requirements of law. See, Affidavit of Dr. Charles Golden attached hereto as Exhibit B.2. These impairments are evidenced in school and mental health records existing at the time and by testing done by Dr. Golden. The State has been provided with a copy of Dr. Golden's notes and test results. Additionally, the cognitive impairments have been verified by testing done by *Page 926 
the State's retained psychologist Dr. Glen King, who evaluated Corey Smith in May 2005. No such expert evidence was presented at Mr. Smith's sentencing hearing and no reason exists, other than counsels' ineffectiveness, for failing to do so.
 ". . . C. At the time of the offense, Corey Smith suffered from a family history that included inter-generational violence and chaos, reflected in part by his father's and stepfather's abuse of his mother and her retaliation, similar male/female physical abuse by a number of other male relatives, his mother's use of alcohol throughout her pregnancy with him, a traumatic birth including the umbilical cord having been wrapped around his neck, verbal and physical abuse and neglect, poverty and deprivation, drug and alcohol abuse, limited physical, mental health and educational resources, overwhelming emotional and educational challenges without positive role models or supportive interventions. The impact on Corey Smith was profound and extensive and directly affected the appropriateness of his behavior, his judgment and his conduct. He was not able to overcome these influences. See, Affidavit of Marjorie Hammock, MSW, LISW attached hereto as Exhibit B.3 and as reflected in the summary of biopsychosocial interviews conducted by Ms. Hammock, attached hereto as Exhibit B.4. No such expert evidence was presented at Mr. Smith's sentencing hearing and no reason exists, other than counsels' ineffectiveness, for failing to do so."
(C.R. 379-81.) The defense also attached affidavits from Maher, Golden, and Hammock; the July 8, 2005, deposition of Maher; and Hammock's interview summaries to the Second Amended Petition.
During the hearing on July 21, 2005, defense counsel argued:
 "Your Honor, I ask you to look at Exhibit B, the August 13th letter with the summary and the State's response. I gave them a disclosure. I gave them the opinions and the basis of the opinions in terms of what they reviewed. When Dr. Golden says his opinion will be Mr. Smith has cognitive problems, that's brain damage. And, when he says it involves higher executive functioning, he's talking about a specific part of the brain. These problems existed at the time of the incident and influenced Mr. Smith's ability to make judgments and conform his behavior to requirements of the law. So he's saying I've done these tests; this is what I found; it shows brain injury. This is the consequence of the brain injury. And the State's response to me was that's sufficient for us. That's what they told me at the time, and they declined to take his deposition that you said they could take at that time. And have never taken his deposition.
 "So how can they come in now and say, we don't know what he's going to say and we're prejudiced when they specifically said what you gave us was sufficient and we didn't want — they're putting blinders on, it seems, and then complaining we don't know what he's going to say.
 "Ms. Hammock's summary which was August of `04, it says she interviewed relatives, friends, teachers, coaches, other individuals, records and documents, psychological, educational, social history documents. Gives her opinion. They told me at the time that is sufficient for us. We're satisfied with that disclosure. You said, if you want to ask her in detail at a deposition, ask her. And they said we don't want to take her deposition. So I don't see how they can come in *Page 927 
here now and complain we're prejudiced because we don't know what they're going to say when they refused to find out.
 "Now, it is not a situation where [the State's counsel] was saying we had to dig this information out. The petitioner was providing this information to them pursuant to conferences with the Court and discussions with the Court and discussions with the counsel as to what it is they were requesting and what you were requiring. And we did that all the way through. There's nothing that they didn't say satisfied them that we're going to be presenting. And, having said we're satisfied and then asking as time went on for more and more information and still declining to take the depositions, I don't see how they can say we're prejudiced because we don't know what they're going to say.
 "They do know what the witnesses are going to say. They had the opportunity to find out in whatever detail they wanted what they were going to say. And what I provided them at the time — not now that we're at the eve of the hearing — what I provided them a year ago was satisfactory. So I would submit the State has waived any claim that it's not satisfactory when they did — If they had said to me, this isn't enough; it's not sufficient; give me more detail. Or, based on these summaries, we're going to take the deposition to find the detail. That was the Court's order* And I just think it's unfair now to say you didn't give us enough when they said what you gave us was enough at the time.
 ". . . .
 ". . . I'm not saying the summaries make the first amended petition sufficient. I'm not saying that. What I am saying is you should allow the second amended petition because there's nothing new or added in the second amended petition that the State hasn't been aware of already. So there's no prejudice to them. There's no surprise. There's no frustration of their ability to defend. So I'm not saying the discovery saves the first petition. I'm saying the discovery is the reason why a second amended petition amendment — a second amendment is reasonable and fair."
(R. 46-49, 51.) For the reasons set forth herein, we agree.
Based on the Alabama Rules of Criminal Procedure and the Alabama Supreme Court caselaw quoted above, the circuit court erred when it set a deadline for amendments and stated that it would allow further amendments "only upon showing of good cause with evidentiary basis." Instead, the circuit court could have properly denied an amendment only upon a finding of undue delay or undue prejudice. When it struck the Second Amended Petition, the circuit court did not cite either of these reasons.
In his Second Amended Petition, the appellant did not raise new claims of which the State did not have prior notice and as to which it was not or could not have been prepared to defend. In fact, he amended only one paragraph — paragraph 105 — in his Second Amended Petition. In that paragraph, he fleshed out with more specificity his previous claim regarding his alleged mental health problems and the experts who would testify about such problems. The State argues that it did not have the specific information about which the experts intended to testify until shortly before the evidentiary hearing. However, the record shows that the State knew about the appellant's experts and their conclusions almost one year before the appellant filed his Second Amended Petition. Also, it had the opportunity to depose the experts and learn more specific information about their opinions almost one year *Page 928 
before the appellant filed his Second Amended Petition, and it specifically chose not to do so. In fact, the State waited until July 8, 2005, and then deposed only Maher. Further, even before the appellant attempted to file a Second Amended Petition, as evidenced by its "Memorandum Brief Concerning Issues to Be Considered by the Court at the Rule 32 Evidentiary Hearing," the State was fully aware of his claims regarding his mental health condition. As the appellant's counsel noted during the evidentiary hearing:
 "I would suggest that because of the discovery that's gone on in this case and because of the opportunity that the State had to find out these opinions in exhausting detail a year ago, that everybody is on a level playing field here.
 "There are no surprises here. . . . I amended one paragraph which was 105. I did not add any new legal claims. All I did was I specified the witnesses and the information that the State has and has had. So it's a technical amendment to be more specific, but it's adding information that the State has had."
(R. 13-14.) Finally, the State retained its own mental health expert to evaluate the appellant and to rebut the appellant's evidence regarding his mental health. Therefore, consideration of the Second Amended Petition, which simply expanded on a claim that had been included in both the original petition and the First Amended Petition, would not have caused undue prejudice to the State.
Also, consideration of the Second Amended Petition would not have adversely affected the circuit court's control over the management of its docket. The record does not indicate that the appellant neglected his case. Rather, it establishes that, despite several continuances, the parties continued to conduct and exchange discovery. The State argues that it would not have had time to respond to the Second Amended Petition before the evidentiary hearing and that another continuance might have been required. However, the only substantive changes were in paragraph 105 of his Second Amended Petition. As is set forth above, the State was already aware of the additional information that was included in the Second Amended Petition. Therefore, it could have easily filed a response to the Second Amended Petition, and there would not have been any reason for any further delay of the evidentiary hearing. Accordingly, consideration of the Second Amended Petition would not have caused undue delay.
Under the specific facts of this case, we conclude that consideration of the appellant's Second Amended Petition would not have caused actual prejudice to the State or caused undue delay. Therefore, the circuit court abused its discretion in striking the appellant's Second Amended Petition. Accordingly, we reverse the circuit court's judgment and remand this case to the circuit court for that court to consider the appellant's Second Amended Petition.[4]
REVERSED AND REMANDED.
McMILLAN, P.J., and COBB, SHAW, and WISE, JJ., concur.
[1] On July 18, 2005, the appellant filed a Second Amended Petition. However, the State objected to the amendment, and the circuit court refused to allow the appellant to amend his petition at that time. See infra.
[2] In a footnote, the State concedes that, "[i]n a letter dated August 13, 2004, Smith's attorney advised that Marjorie Hammock `has spoken with and/or is relying on interviews with Corey Smith's relatives, friends, teachers, coaches, and other individuals in the community.'" (C.R. 287.)
[3] In a footnote, the State concedes that, "[i]n the August 13, 2004 letter, Dr. Charles Golden was identified as an expert who would say that Smith had significant cognitive problems or difficulty with higher or executive functioning. Smith has not pleaded in the petition or amended petition that he had significant cognitive problems or difficulty with higher or executive functioning." (C.R. 289.)
[4] Because of our disposition of the argument addressed in this opinion, we pretermit discussion of the remaining arguments the appellant raises in his brief to this court. *Page 929