KELLUM, Judge.
The appellant, Corey Schirod Smith, currently an inmate on death row at Holman Correctional Facility, appeals the circuit court’s denial of his petition for post-conviction relief filed pursuant to Rule 32, Ala. R.Crim. P.
In 1995, Smith was convicted of capital murder for murdering Kimberly Ann Brooks during the course of a kidnapping in the first degree. See § 13A-5-40(a)(l), Ala.Code 1975. The jury unanimously recommended that Smith be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Smith to death. Smith’s conviction and death sentence were affirmed on direct appeal. See Smith v. State, 797 So.2d 503 (Ala.Crim.App.2000), cert. denied, 797 So.2d 549 (Ala.), cert. denied, 534 U.S. 962, 122 S.Ct. 371, 151 L.Ed.2d 282 (2001). This Court issued the certificate of judgment making Smith’s direct appeal final on May 11, 2001. See Rule 41(a), Ala. R.App. P.
In June 2002, Smith filed a timely petition for postconviction relief.[1] He filed amended petitions in September 2002 and in July 2005. An evidentiary hearing was conducted in July 2005 at which time the State objected to the second amended petition. The circuit court struck Smith’s second amended petition and Smith appealed. This Court reversed the circuit court’s rul *226 ing and directed that court to consider Smith’s second amended petition. Smith v. State, 961 So.2d 916 (Ala.Crim.App.2006).
In December 2007, the circuit court conducted a second evidentiary hearing and in December 2008 issued a 130-page order denying Smith’s second amended petition for postconviction relief.[2] This appeal followed.
On Smith’s direct appeal, we stated the following concerning the facts surrounding Brooks’s murder:
“On February 24, 1995, Tallapoosa [County sheriffs deputies] discovered the charred body of Kimberly Brooks rolled in a carpet; the carpet was lying beside a dirt road in Bibb Town. The coroner testified that Brooks had been shot in the head and the stomach and that there was soot in her lungs and trachea; he testified that she died of the ‘shots to the head [and] the chest and possible asphyxiation and burning.’
“Smith handwrote the following confession for the police:
“ ‘Kim came to the house around 7:30 a.m. Wednesday morning with Labreasha Main. We was talking about getting married later on. My brother Reginald came and Main left. After awhile, Reginald left.
“‘When my mamma got off work, me and Kim got into an argument about another girl calling me. We went outside. I pulled my gun on her. Sanjay [Brooks] and Shontai [Smith] pulled up. I forced her into the van. I told Sanjay to go to Bibb Town, which he did. And, when we got there, Kim and I got out, continuing arguing.
“ T told her I love her, and if I couldn’t have her, no one could. She told me she loved me but things weren’t the same. I kissed her on the forehead and pushed her off me and shot her in the chest. And then she fell to the ground, and I shot her again toward her head.
“ ‘Shontai got out and helped me drag her into the bushes. We left. Sanjay dropped us off into the soft sands. When he returned, we got James Shealey[’s] car and got some gas and went back where I left her. When we got there, she was standing up, and she got in the car and sat beside me. I was scared.
“ ‘Sanjay rode from Bibb Town to Reeltown looking for a place to set her on fire and bury her. I asked her what would she say if I took her to the hospital. She sa[id], “I’m going to say Corey shot me.” We returned back to Bibb Town, and Sanjay drop us off — dropped us off. He told us to go ahead and finish her and he’ll be back.
“ ‘We put a trash bag over her face until she died. I poured the gas on her, and Shontai lit the lighter. San-jay never returned.
“ ‘We left there and walked back to my house. Shontai spent the night. The next [day] he left and I never saw him again.’
“Smith’s codefendants, Sanjay Brooks and Shontai Smith, Smith’s cousins, pleaded guilty to murder and to kidnapping and received life sentences in exchange for their trial testimony against Smith. Brooks was sentenced to con *227 current life sentences on each count and Shontai Smith was sentenced to two consecutive life sentences. Both codefen-dants testified at trial and corroborated Smith’s statement. Shontai Smith further testified, concerning setting Brooks’s body on fire, that after he and Smith poured gasoline on Brooks and ignited her, the fire got out of control; to stop it they threw sand on Brooks’s body. The two then placed her body in a piece of carpet that had been left in the dump area and rolled her body in the carpet.
“Two other witnesses testified that on the day of the murder Smith told them that he had killed Kimberly. One witness, Larry Butler, testified that Smith told him that he had killed Kimberly and that he needed gasoline to dispose of her body.”
797 So.2d at 509.

Standard of Review

Smith appeals the circuit court’s denial of his petition for postconviction relief attacking his capital-murder conviction and sentence of death. Smith initiated the proceedings and, according to Rule 32.3, Ala. R.Crim. P., bears the sole burden of pleading and proving that he is entitled to relief. Rule 32.3 states:
“The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.”
When reviewing Smith’s claims on direct appeal, we applied the plain-error standard of review and examined every claim whether or not an objection was made in the circuit court. See Rule 45A, Ala. R.App. P. However, the plain-error standard does not apply when evaluating a circuit court’s ruling on a postconviction petition. See Ferguson v. State, 13 So.3d 418, 424 (Ala.Crim.App.2008); Waldrop v. State, 987 So.2d 1186 (Ala.Crim.App.2007); Hall v. State, 979 So.2d 125 (Ala.Crim.App.2007); Gaddy v. State, 952 So.2d 1149 (Ala.Crim.App.2006). “The standard of review this Court uses in evaluating the rulings made by the trial court is whether the trial court abused its discretion.” Hunt v. State, 940 So.2d 1041, 1049 (Ala.Crim.App.2005).
“‘[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.’ Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). ‘Moreover, “when reviewing a circuit court’s rulings made in a post-conviction petition, we may affirm a ruling if it is correct for any reason.” ’ Lee v. State, 44 So.3d 1145, 1149 (Ala.Crim.App.2009), quoting Bush v. State, 92 So.3d 121 (Ala.Crim.App.2009).”
Dunaway v. State, [Ms. CR-06-0996, December 18, 2009] - So.3d -, - (Ala.Crim.App.2009).
Last, we may affirm a circuit court’s ruling on a postconviction petition if it is correct for any reason. See McCartha v. State, 78 So.3d 1014 (Ala.Crim.App.2011); Bryant v. State, [Ms. CR-08-0405, February 4, 2011] — So.3d - (Ala.Crim.App.2011).
I.
Smith first argues that the circuit court erred in denying his claim that his counsel’s performance was ineffective at the penalty phase of his capital-murder trial. Specifically, he asserts that his counsel failed to investigate and present evidence of his mental-health problems and his family background and that the failure to *228 present this mitigation evidence prejudiced him.
To establish a claim of ineffective assistance of counsel, a petitioner must show: (1) that counsel’s performance was deficient; and (2) that he was prejudiced by the deficient performance. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
“Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See Michel v. Louisiana, [350 U.S. 91], at 101 [(1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
Strickland, 466 U.S. at 689.
In Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the United States Supreme Court found counsel’s performance ineffective at the penalty phase of a capital-murder trial because counsel failed to present a plethora of mitigating evidence concerning Wiggins’s upbringing and his mental deficiencies. The court stated:
“In finding that [trial counsel’s] investigation did not meet Strickland’s [u Washington, 466 U.S. 668 (1984),] performance standards, we emphasize that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the ‘constitutionally protected independence of counsel’ at the heart of Strickland, 466 U.S., at 689. We base our conclusion on the much more limited principle that ‘strategic choices made after less than complete investigation are reasonable’ only to the extent that ‘reasonable professional judgments support the limitations on investigation.’ Id., at 690-691. A decision not to investigate thus ‘must be directly assessed for reasonableness in all the circumstances.’ Id., at 691.
“Counsel’s investigation into Wiggins’ background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records — evidence that would have led a reasonably competent attorney to investigate further.”
539 U.S. at 533-34.
“When a claim of ineffectiveness is based on an attorney’s failure to present *229 evidence of mitigating circumstances, this Court has rejected the argument that such a failure constitutes ineffective assistance per se. Recognizing that some so-called ‘mitigating’ evidence can actually have a negative impact upon the jury, the Court has held that ‘the posture of a given case may well justify, if not require, an effective attorney to refrain from presenting such evidence.’ Stanley v. Zant, 697 F.2d 955, 961 (11th Cir.1983), cert. denied, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984).”
Smith v. Dugger, 840 F.2d 787, 795 (11th Cir.1988).
The record indicates that Smith was represented at trial and on direct appeal by attorneys Lee Sims and Palmer Singleton. Both attorneys testified at the July 2005 postconviction evidentiary hearing.
When denying relief on this claim, the circuit court stated:
“Petitioner Smith claims that his trial counsel were ineffective for failing to investigate and present evidence of his alleged mental health problems at the penalty phase of his trial, including evidence that would have shown that he was suffering from Post Traumatic Stress Disorder, Poly-Substance Abuse, a frontal and temporal lobe brain impairment, and brain damage at the time of the offense and that he was emotionally and psychologically immature at the time of the crime....
[[Image here]]
“As the Alabama Court of Criminal Appeals held on direct appeal, Smith’s counsel, Palmer Singleton and Lee Sims, conducted a thorough mitigation investigation and went to great lengths to prepare a penalty phase defense for him. Smith [v. State ], 797 So.2d [503] at 523 [ (Ala.Crim.App.2000) ] (‘Defense counsel presented a thorough penalty-phase defense; there is no doubt, based on the record, that counsel was prepared for that phase of the proceedings.’). Based on this Court’s review of the record and this Court’s understanding of his counsel’s testimony at the evidentiary hearing in 2005, this Court finds that his counsel’s penalty phase strategy was to humanize Smith by presenting evidence through sixteen witnesses about his troubled childhood, his young age at the time of the crime, his exposure to violence in the home, his relationship with his daughter, and his efforts to better himself so that he could care for his daughter. In addition, twelve of those witnesses were Smith’s family members, and they testified as to their love for him and his importance to their family and asked the jury for mercy.
“In sum, this Court finds that Smith’s counsel decided to present evidence to the jury that would humanize him and focus the jury’s attention on the impact of a death sentence on his family. Their decision was reasonable and strategic, and this Court will not ‘second-guess’ it. See, e.gv, Crawford [v. Head], 311 F.3d [1288] at 1312 [ (11th Cir.2002) ] (‘This court agrees that testimony from a mental health expert ... would have been admissible and might be considered to be mitigating. However, trial counsel chose to pursue a strategy of focusing the jury’s attention on the impact of a death sentence on petitioner’s family. This court will not second guess trial counsel’s deliberate choice.’); Boyd v. State, 746 So.2d 364, 398 (Ala.Crim.App.1999) (‘Trial counsel stated that the defense strategy was to humanize Boyd for the jury ... [W]e do not find counsel’s efforts to be ineffective.’).
“For the foregoing reasons, Petitioner Smith has failed to satisfy his burden of proving deficient performance under Strickland, with regard to this claim *230 that his trial counsel were ineffective for failing to present evidence of his alleged mental health problems and family background at the penalty phase of his trial. Because he failed to prove that his trial counsel were deficient in not presenting that evidence, Smith’s claim is denied, under Rule 32.7(d) of the Alabama Rules of Criminal Procedure.”
(Supp. R. 106-16) (emphasis in original). With regard to the prejudice prong of the Strickland test, the circuit court made the following findings:
“To prove prejudice under Strickland, a petitioner must show that ‘there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.’ Strickland, 466 U.S. at 695. For that reason, in determining whether, ‘without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different,’ a court must consider the aggravating circumstances that were proved beyond a reasonable doubt at trial. Bolender [v. Singletary ], 16 F.3d [1547] at 1556-1557 [ (11th Cir.1994) ].
“In this case, the trial court found the existence of the following two aggravating circumstances: (1) the capital offense was committed while the defendant was engaged in the act of kidnapping in the first degree, pursuant to § 13A-5-49(4) of the Code of Alabama [1975]; and, (2) the capital offense was especially heinous, atrocious, or cruel as compared to other capital offenses, pursuant to § 13A-5-49(8) of the Code of Alabama. The trial court found the existence of the following three statutory mitigating circumstances: (1) the defendant has no significant history of prior criminal activity, pursuant to § 13A-5-51(1) of the Code of Alabama [1975]; (2) the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, pursuant to § 13A-5-51(2) of the Code of Alabama [1975]; and (3) the age of the defendant at the time of the crime, pursuant to § 13A-5-51(7) of the Code of Alabama [1975]. The trial court also found the existence of some nonstatutory mitigating circumstances, including, among other things, Smith’s father’s abuse of his mother and the love and devotion of his family and friends.
“In sentencing Smith to death, the trial court found that the aggravating circumstances ‘far outweigh all the miti-gators that can be compiled in favor of him.’ In explaining why the two aggravating circumstances outweighed the statutory and nonstatutory mitigating circumstances, the trial court stated:
“ ‘After giving full measure and weight of each of the aggravating and mitigating circumstances, and taking into account the recommendation of the jury contained in its advisory verdict, it is the judgment of the court that [the] aggravating circumstances outweigh [the] mitigating circumstances shown by the evidence in this case. The aggravating circumstances speak for themselves and carry great weight in the mind of any reasonable and rational person. It is clear that the murder that was committed in this case was deliberately and intentionally planned and carried out. When Corey Schirod Smith found the victim standing beside the road after he shot her, he was given the opportunity to display his humanity. Instead, he unequivocally displayed a savage intention to kill. He ignored pleas for help, and the murder was carried out in a torturous fashion. First, he led her to *231 the place of her death; and she no doubt had full knowledge of the fact that she was about to be killed. Then he deprived her of the very breath of life. Even though the fire was lit to dispose of the remains, its real effect was to complete the execution by use of gasoline and fire. There is no mistake about the tremendously evil intent of this defendant.
“ “When the court weighs the aggravating circumstances against the mitigating circumstances in the manner the law requires, there is absolutely no question and can be no question in the mind of any reasonable human being that the aggravating circumstances far outweigh the mitigating circumstances.’
“As noted above, the jury recommended that Smith be sentenced to death by a vote of twelve to zero.
“In light of the brutal nature of the crime and the specific findings made by the trial court that sentenced Smith to death, there is no reasonable probability that the presentation of evidence regarding his alleged mental health problems or the presentation of additional evidence regarding his family background would have altered the balance of the aggravating and mitigating circumstances that led to the imposition of the death penalty. Evidence of his alleged mental problems would not have altered, diminished, or undermined the aggravating circumstances. Likewise, that evidence would not have refuted or called into question the facts surrounding Smith’s crime.
“In addition, there is no reasonable probability that the presentation of evidence regarding his alleged mental health problems or the presentation of additional evidence regarding his family background would have altered the jury’s unanimous recommendation of a death sentence or the trial court’s finding that the aggravating circumstances ‘far outweigh’ the mitigating circumstances ....
“Moreover, this Court has considered the testimony of the witnesses who testified at the evidentiary hearings in 2005 and 2007 and cannot credit Dr. Maher’s testimony that Smith was suffering from Post-Traumatic Stress Disorder and brain damage at the time of the offense or Dr. Golden’s testimony that Smith was suffering from brain damage at the time of the offense. Instead, this Court finds that Dr. King’s testimony that Smith never has suffered from Post-Traumatic Stress Disorder, functions in the high-borderline to low-average range of intellectual functioning, probably suffers from learning disabilities, and otherwise functions normally is supported by the evidence in the record, and this Court, therefore, credits his testimony. For that additional reason, this Court concludes that there is no reasonable probability that the presentation of evidence regarding Smith’s alleged mental health problems would have altered the jury’s unanimous recommendation of a death sentence or the trial court’s finding that the aggravating circumstances ‘far outweigh’ the mitigating circumstances. This Court summarized the testimony of the witnesses who testified at those evidentiary hearings on pages 9-65 of this order and will not repeat that summary here.
“For the foregoing reasons, Petitioner Smith has failed to satisfy his burden of proving deficient performance and prejudice, under Strickland, with regard to his claim that his trial counsel were ineffective for failing to present evidence of his alleged mental health problems and family background at the penalty phase of his trial. That claim is, therefore, *232 denied, under Rule 32.7(d) of the Alabama Rules of Criminal Procedure.”
(Supp. R. 117-23.)
“Although [Smith’s] claim is that his trial counsel should have done something more, we.first look at what the lawyer did in fact.” Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir.2000). “[B]efore we can assess the reasonableness of counsel’s investigatory efforts, we must first determine the nature and extent of the investigation that took place.... ” Lewis v. Horn, 581 F.3d 92, 115 (3d Cir.2009).
The record of Smith’s direct appeal indicates that at the penalty phase of Smith’s capital-murder trial counsel presented the testimony of 16 witnesses. The witnesses included Smith’s mother, two brothers, two sisters, two aunts, two cousins, an uncle, his stepfather, his stepmother, a prospective employer, a little-league coach, one of Smith’s 10th-grade teachers, and a friend.
Mother. Emma Moore Forte, Smith’s mother, testified that Smith was the middle child of three children, that Smith was small when he was young and he was different because he did not talk, that she took him to a doctor, and that the doctor said that nothing was medically wrong with him. She testified that Smith stuttered until he was about seven years of age and that the other children made fun of him. She was not married to Smith’s father, she said, and Smith’s father did not acknowledge Smith as his son until Smith was about five or six years old. Forte said that Smith’s father seldom paid child support, that she often went to court over his failure to pay, that he was violent and frequently beat her, and that on one occasion he-came to her house waving a gun at her. After Smith’s daughter was born, she said, Smith changed and he tried to better himself by getting a General Equivalency Diploma (“GED”).
Siblings. Reginald Smith, Smith’s older brother, testified that Smith had a two-year-old daughter named Labreasha, that he had been helping with the child, and that he frequently fed, bathed, clothed, and played games with her. He said that since Smith became a father he was determined to get a job and provide for the child and that he was studying to obtain a GED. Reginald further testified that Smith’s father was not around when he was growing up. Katrine Smith, Smith’s half-brother, said that when Smith became a father he tried to change his life for the better. Chowon Smith, Smith’s half-brother, testified that he helped Smith study for his GED. He also said that Smith had problems with his speech when he was growing up. Latrice Smith, Smith’s older half-sister, testified that she also helped Smith study for his GED and that he worked hard but did not pass the test.
Other family members. Annie Butler, Smith’s aunt, testified that as a child Smith was “very quiet. He stayed to himself a lot, and he had a speech problem.” (Direct appeal R. 2225.) She described one incident when Smith’s mother was at her trailer when Smith’s father came looking for her. She said that Smith’s father was carrying a gun and that he shot into the trailer. Butler said that Smith’s mother had scars on her body from places where Smith’s father had beat her. Marrell Hayes, Smith’s cousin, testified that Smith had a very violent home life and at one time Hayes signed a warrant for Smith’s father’s arrest after he beat and threatened Smith’s mother with a pistol. Larry Butler, Sr., Smith’s uncle, testified that when Smith was young he was shy, quiet, and had a speech problem. Jelma Smith, Smith’s stepmother, testified that Smith had a bad stutter when he was growing up and that the other children mocked him. She testified about the abuse she suffered at the hands of Smith’s father. Latasha *233 Butler, Smith’s cousin, testified how important being a father was to Smith and that the baby was his life. Casbie Forte, Smith’s stepfather, testified that Smith was shy and quiet growing up and that he had a speech problem. He also testified that Smith was a good father, that Smith tried to work, and that Smith tried to get his GED.
Teachers. Rebecca Taunton, Smith’s 10th-grade English teacher, testified that Smith was quiet and withdrawn and that she had never met a child who was as quiet as Smith. Gene Coan, Smith’s little league coach, testified that Smith played with the Dixie League team when he was 10 years old and that he had made the All-Stars team, that he was a hard worker, and that he was quiet and did not interact with the other children.
Friend. Arlene Hooks, who was dating Smith’s brother at the time of the murder, testified that she helped Smith by showing him how to take care of his baby and that she frequently observed Smith caring for his daughter.
At the July 2005 evidentiary hearing on Smith’s postconviction petition, Smith presented the following testimony:
Palmer Singleton testified that he had been licensed to practice law since 1981 and that he was appointed to represent Smith in 1995. Singleton said that he works for the Southern Center for Human Rights in Atlanta, Georgia, that he teaches criminal law and capital punishment at Emory University and Georgia State College of Law, and that he was admitted to the Bar in Alabama pro hac vice to represent Smith. At the time that he was appointed, he said, he had participated in eight previous capital-murder trials. He moved for funds to secure the services of a social worker and a mitigation expert, and the motions were granted. Counsel also moved that he be given access to all of Smith’s records, including any mental-health records. Counsel was in possession of Smith’s records from the community hospital, Community Medical Arts Center, school records, GED records, juvenile court records, records from the Mt. Meigs detention facility, Lee County Youth Development records, employment-application records, and Department of Human Resources records. Singleton also talked with Smith and his family members. When asked why he did not present evidence related to Smith’s mental health, he stated:
“I knew early on in the case. And, I don’t know if I knew from the [district attorney], the Assistant [district attorney], I could have gotten a phone call from another defense attorney, that Mr. Smith had another active pending felony case in an adjacent jurisdiction. The case terrified me. Why? Because the facts all too closely paralleled what the charged case was in Tallapoosa County.
“It was a very violent abduction of a woman. She was taken to a remote area. As I recall, again, it was a refuse dump. The only significant difference that I could see between the charged offense and this unadjudicated other criminal offense was that in that case that person had survived. Unfortunately, Ms. Brooks hadn’t. I was so terrified, as bad as the charged case was, how do you make it worse? And any death case can get worse. You bring another one that is just like it. My goal, number one was to do nothing that would open the door to that other crimes evidence coming in. That was goal number one. As a result I totally misread the case.
“How do I prevent, or how do I make sure I don’t open the door to that stuff coming in? By not putting mental state in issue. Because if I develop expert *234 testimony, I develop a diagnosis of Corey Smith, the State has the right to develop a counter diagnosis. And I was terrified that in the course of developing that counter diagnosis, they would have the right to, at least, examine my expert and their expert, and maybe even introduce extrinsic evidence about this other abduction assault. So to prevent — my misread was overestimating the potential devastating affect of the thing that never materialized. It just wasn’t a problem. But it dominated my thinking. I let it tie our hands. As a result I let it cripple the defense of Mr. Smith in the penalty phase of the case.
“So, did I have a reason for not developing mental health testimony at the penalty phase? You betcha, but it was a reason that was faulty. It wasn’t based on seeing what was out there and developing as best we could potential mental health. It totally reflected a unilateral decision by me, not by Mr. Sims, that it was a road we couldn’t even take a step down much less go the whole distance because of the risk that we would open the door to this other assault, and that was wrong. It was a mistake.”
(July 2005 hearing, R. 214-15.)
Lee Sims testified that he had been licensed to practice law in Alabama since 1971 and that he was appointed to represent Smith in 1995. He said that he had participated in two previous capital-murder trials before being appointed to Smith’s case. Sims testified that he believed that a mental evaluation was necessary but that Singleton was opposed to the evaluation. He testified that Singleton did not want to pursue a mental-health defense because, he said, he was afraid of opening the door to potential damaging testimony. Sims further testified that he was aware of Smith’s drug use.
Reginald Smith, Smith’s older brother, testified at the July 2005 hearing in greater detail than he did at the penalty phase of Smith’s trial. He testified about his father’s abuse of their mother and how the children witnessed the abuse. Reginald also testified that on occasion he would hit Smith.
Dr. Michael Maher, a psychiatrist, testified that he was retained by Smith to conduct a psychiatric evaluation of Smith. He testified that in June 2002, he met with Smith for about two and a half hours and performed a mental-status examination on Smith. Dr. Maher testified that it was his opinion, based on his meeting with Smith and his evaluation of Smith’s records, that Smith suffered from post-traumatic stress disorder (“PTSD”) at the time of the murder, which affected his state of mind. It was also his opinion that Smith suffered from poly-substance abuse and that he was psychologically and emotionally immature at the time of the murder. Dr. Maher testified that his diagnosis was based on what Smith told him and what was in Smith’s records. No medical tests were performed on Smith.
In rebuttal, the State presented the testimony of two of Smith’s former teachers. Karen White, Smith’s 7th- and 8th-grade English teacher, testified that Smith attended class regularly, that she never saw any evidence that he had been physically abused, and that she never saw any evidence that Smith was intoxicated. John Wilcox, Smith’s 9th-grade history teacher, testified that Smith attended classes regularly, that he did not see any evidence of bruises or evidence indicating that Smith was intoxicated, and that Smith was not a discipline problem.
At the December 2007 evidentiary hearing, the following testimony was presented:
*235 Dr. Charles Golden, a psychologist and professor of psychology, testified that he conducted a series of psychological tests on Smith and that it was his opinion that Smith functioned at a borderline intelligence level with problems in executive functioning[3] and that these deficits would affect Smith’s ability to conform his conduct to the requirements of law. He testified that Smith’s brain deficiency was in the “higher cortical centers of the brain.” These deficits, Dr. Golden said, would affect Smith’s impulse control.
Dr. Maher testified that Smith had brain abnormalities that resulted in “frontal lobe syndrome,” which, in turn, affects his maturity and his impulse control. On cross-examination Dr. Maher conceded that he saw no records indicating that Smith had suffered from any brain injury.
Marjorie Hammock, a clinical social worker, testified that she conducted a biopsychosocial assessment on Smith. She said that Smith had a “history of considerable violence, deprivation, family patterns of violence toward each other.”
To rebut Smith’s mental-health testimony, the State presented the testimony of Dr. Glen King, a clinical psychologist. Dr. King testified that he evaluated Smith on May 10 and 11, 2005, that he administered the Halstead-Reintan Neuropsychological Test Battery and Wide Range Achievement Test, and that he reviewed a number of Smith’s records, which included his school records, records from Mt. Meigs detention facility, and Lee County Youth Development Center records. Dr. King testified that none of the records he reviewed indicated that Smith had been abused. (R. 75.) He further testified that the intelligence tests he conducted on Smith indicated that Smith had a verbal IQ of 93, a performance IQ of 88, and a full-scale IQ of 90. It was his opinion that Smith functioned at the “high-borderline to low-average range,” that Smith did not suffer from PTSD, and that there was no evidence indicating that Smith had any serious psychiatric or psychological disorder. In testifying why he believed that Smith did not suffer from PTSD, Dr. King explained:
“Well, to be diagnosed with that condition one has to be — one has to meet two thresholds of criteria. The first one is that there has to be either a significant actual or threat of death or serious injury that that person has witnessed or been exposed to. In other words, a traumatic event. And subsequently that, in addition, there has to have been a significant emotional reaction: intense horror, fright, anxiety, something of that nature. I know of no circumstance that Mr. Smith has ever identified to me, or anyone else, that would indicate that he had any kind of traumatic event occur like that in his life. It has been somewhat common more recently for people to try to diagnosis Post Traumatic Stress Disorder based on a compilation of life events. But, that is not the criteria that are indicated in the Diagnostic and Statistical Manual. In addition to meeting those threshold requirements, which I don’t think he meets, but even if he did meet threshold requirements, there are then three additional areas *236 that a person needs to show symptoms. One is that there is persistent reliving of some aspect of the traumatic event, either nightmares, visions, hallucinations, something of that nature. The second group of symptoms — you have to have at least one of those. The second group of symptoms is that here is an avoidance of the initial area, or traumatic event, or occurrence of the event. There has to be at least two symptoms indicating a consistent and persistent avoidance. And thirdly there has to be a number of other symptoms that occur in a pervasive fashion. In other words they have to occur over a long period of time. Usually diagnosed by somebody else as a chronic condition. You have to have at least three of those symptoms. He never reported to me nor have I seen him talk to anybody, especially in the records, for example, from Mt. Meigs or Lee County Youth Development Center, all of whom found him to be normal, no neurological defects, no mental health problems, no difficulties whatsoever on three separate occasions when he was admitted to those facilities. Never said anything about those things. Nobody saw any of them. He has never, to my knowledge, he has never shown any persistent avoidance. The avoidance would be of his family. He still has a reasonably good relationship with them up until [the] time he left with Casbie Forte and his mom and his daughter. And, lastly the other symptoms have to do with persistent symptoms such as difficulty falling or staying asleep, inability — irritability or outbursts of anger, difficulty concentrating, hypervigilance, exaggerated startle response. These data are required to occur on a regular basis, not just once that they are persistent symptoms and pervasive symptoms. He doesn’t have — or did not have them when I saw them or have those symptoms when anybody has seen him at any other treatment facility. I think more importantly the argument is that he had this at the time of the offense. Well, he had been at Lee County Youth Development Center and Mt. Meigs within two years immediately proceeding the time of the offense and showed none of those symptoms to anybody there, and there were multiple health professionals who would have been able to diagnose that.”
(R. 89-92.) Smith is “functioning in the low-average to high-borderline range of intellectual ability. That he has probably a learning disability involving reading. And that otherwise he is normal,” Dr. King said. (R. 70.) It was Dr. King’s opinion that the intelligence tests conducted by Dr. Golden were not conducted in the proper manner because, he testified, Dr. Golden did not record Smith’s responses. Based on his assessment, Dr. King said, he found “no evidence to indicate frontal or temporal lobe damage or any kind of brain damage.” (R. 70.) Dr. King disagreed with the major diagnoses expressed by Smith’s experts.
Smith makes numerous arguments in his brief as to why counsel’s performance was deficient at the penalty phase for failing to investigate and present mental-health testimony. However,
“[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel’s performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel’s performance. If it is easier to dispose of an ineffectiveness claim on the ground *237 of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.”
Strickland, 466 U.S. at 697 (emphasis added).
“In assessing prejudice under Strickland, the question is not whether a court can be certain counsel’s performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. See Wong v. Belmontes, 558 U.S. 15, 26, 180 S.Ct. 388, 390 [ (2009) ] (per curiam) Strickland, 466 U.S., at 693. Instead, Strickland asks whether it is ‘reasonably likely’ the result would have been different. Id., at 696. This does not require a showing that counsel’s actions ‘more likely than not altered the outcome,’ but the difference between Strickland’s prejudice standard and a more-probable-than-not standard is slight and matters ‘only in the rarest case.’ Id., at 693. The likelihood of a different result must be substantial, not just conceivable. Id., at 693.”
Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 791-92, 178 L.Ed.2d 624 (2011).
“A careful prejudice inquiry requires that we ‘consider all the relevant evidence that the jury would have had before it if [counsel] had pursued [a] different path.’ Wong [v. Belmontes ], [558] U.S. 15, 130 S.Ct. [383] at 386 [ (2009) ]. This includes evidence that was adduced at trial as well as that which was not presented until postconviction review. See Porter [v. McCollum ], 558 U.S. 30, 130 S.Ct. [447] at 454 [(2009)]. Stated differently, we must reconstruct the record and assess it anew. In so doing, we cannot merely consider the mitigation evidence that went unmentioned in the first instance; we must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner’s mitigation testimony. See Wong, 558 U.S. 15, 130 S.Ct. at 390 (stating that ‘the reviewing court must consider all the evidence — the good and the bad — when evaluating prejudice’). Once we have reconstructed the record, we must ‘reweigh the evidence in aggravation against the totality of available mitigation evidence.’ Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Only then may we ask whether there is a reasonable probability that, but for counsel’s ineffectiveness, the result of the proceeding would have been different,”
Williams v. Beard, 637 F.3d 195, 227 (3d Cir.2011). “In evaluating the Strickland prongs of deficiency and prejudice, it is important to focus on the nature of the mental mitigation [the petitioner] now claims should have been presented.” Rutherford v. State, 727 So.2d 216, 223 (Fla.1998).
“[I]n situations where the mitigating evidence has undeniable potency, a court evaluating an ineffective assistance claim may conclude that the evidence entails an inextricable aggravating component that offsets its mitigating effect, or that it would have inevitably opened the door to devastating rebuttal evidence had it been presented at trial. In either event, a failure to locate or present the mitigation evidence may be regarded as harmless.”
Kyle Graham, Tactical Ineffective Assistance in Capital Trials, 57 Am. U.L.Rev. 1645, 1683 (2008).
*238 The vast majority of the testimony concerning Smith’s family and his upbringing that was presented at the 2005 and 2007 evidentiary hearings had been presented by the 16 witnesses who testified during the penalty phase of Smith’s trial.
“ ‘ “[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation.” Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir.2007) (quoting Broom v. Mitchell, 441 F.3d 392, 410 (6th Cir.2006)).’ Eley v. Bagley, 604 F.3d 958, 968 (6th Cir.2010). ‘This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.’ United States v. Harris, 408 F.3d 186, 191 (5th Cir.2005). ‘Although as an afterthought this [defendant’s father] provided a more detailed account with regard to the abuse, this Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.’ Darling v. State, 966 So.2d 366, 377 (Fla.2007).”
Daniel v. State, 86 So.3d 405 (Ala.Crim.App.2011).
Moreover, the expert testimony concerning Smith’s mental health was to a large extent controverted by the State’s mental-health expert. Declining to find ineffective assistance of counsel in a similar situation, the Florida Supreme Court, in Cherry v. State, 781 So.2d 1040 (Fla.2000), stated:
“Even if this Court found counsel’s conduct to be deficient, Cherry would not be entitled to a new sentencing unless he showed prejudice from counsel’s alleged errors. The trial court found four aggravating factors in this case: the murder was committed during a burglary; the murder was committed for pecuniary gain; Cherry had a prior violent felony conviction; and the murder was HAC [heinous, atrocious, or cruel]. Although we later held that the murder during the commission of a burglary and pecuniary gain aggravators should have been considered as one, that still leaves three aggravating factors, one of which is HAC. The trial court also instructed the jury on three statutory mitigating factors: the crime for which the defendant was to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance; the defendant acted under extreme duress or under the substantial domination of another person; and the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. These are the same three mitigators Dr. Crown believes to exist in this case. The jury was also instructed that it could consider any aspect of the defendant’s character.
“Unlike Rose [v. State, 617 So.2d 291 (Fla.1993) ], however, the testimony concerning the statutory mitigating evidence and some of the nonstatutory mitigating evidence was controverted either by the State during cross-examination or by Dr. Barnard. The trial court rejected Dr. Crown’s conclusions as to organic brain damage, fetal alcohol syndrome, and mental retardation to the extent they were based on mere speculation from the fact that Cherry’s mother drank while pregnant and Cherry had been exposed to toxins as a child. Dr. Crown admitted that he had not performed any physical tests on Cherry to confirm these conclusions. The trial court also found that Dr. Crown’s findings as to Cherry’s borderline retardation and antisocial personality were contradicted by Dr. Barnard’s reassessment of Cherry. Most significantly, Dr. Barnard, after considering the same back *239 ground materials supplied to Dr. Crown, did not find any indication of organic brain damage and maintained the information did not support any statutory mitigating factors.”
781 So.2d at 1050-51. See also Wong v. Belmontes, 558 U.S. 15, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) (“[T]he notion that the result could have been different if only [the attorney] had put on more than the nine witnesses he did, or called expert witnesses to bolster his case, is fanciful.”); Commonwealth v. Lesko, 15 A.3d 345, 385 (Pa.2011) (“We do not believe there is a reasonable probability that further expert opinion evidence, including evidence of Lesko’s ‘organic brain damage’ would have resulted in a different weighing and different penalty verdict when the aggravating circumstances were so patently grave, and the jury already found substantial mitigating factors, only to return with a verdict of death. This was not an instance where the sentence of death was ‘only weakly supported by the record.’ Instead, it was a situation where the sentence was imposed with ‘overwhelming record support.’ ”); Ford v. Hall, 546 F.3d 1326, 1338 (11th Cir.2008) (“In light of the jury’s finding of three statutory aggravating circumstances, and the fact that [the defendant] shot a child in the head at close range, this omitted mitigation evidence is not compelling.”).
“ ‘Surmounting Strickland’s high bar is never an easy task.’ Padilla v. Kentucky, 559 U.S. 356, 371, 130 S.Ct. 1473, 1485 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest ‘intrusive post-trial inquiry’ threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S. at 689-690.”
Harrington v. Richter, — U.S. at -, 131 S.Ct. at 788.
In this case two aggravating circumstances were found to exist: that the murder was committed during a kidnapping and that the murder was especially heinous, atrocious, or cruel when compared to other capital murders. In mitigation the court found that Smith had no significant history of prior criminal activity, that Smith was 18 years old at the time of the murder, and that the murder was committed while Smith was under the influence of extreme mental or emotional disturbance because he feared the “prospective loss or impairment of his relationship with his child.” The court also found as nonstatu-tory mitigating circumstances that Smith had no male figure in his household when he was a child, that Smith’s home environment was abusive, that Smith had a good relationship with his daughter, and that Smith helped police locate Brooks’s body. We are confident, as was the postconviction court, that presenting evidence of Smith’s mental health, which was in large part disputed by the State’s expert, and even more evidence of his upbringing, would had had no impact on the results in the penalty phase of Smith’s capital-murder trial. Accordingly, Smith failed to meet the prejudice prong of the Strickland test. The circuit court correctly denied relief on Smith’s claim that his counsel was ineffective at the penalty phase of his capital-murder trial.
II.
Smith next argues that his counsel was ineffective for failing to object to the application of § 13A-5^9(8), Ala.Code 1975, the aggravating circumstance that the murder was especially heinous, atrocious, *240 or cruel as compared to other capital murders.
The circuit court made the following findings concerning this claim:
“Smith alleges that his counsel were ineffective for failing to argue at trial and on direct appeal that there was ‘no evidence ... regarding whether the victim was conscious and aware of her suffering and that there was, therefore, insufficient evidence to support the especially heinous, atrocious, or cruel aggravating circumstance. Because his assertion that there was ‘no evidence’ to support a finding that the victim was conscious and aware of her suffering is refuted by the record, Smith cannot satisfy his burden of proving deficient performance and prejudice, under Strickland, with regard to this claim.
“In support of a finding that Smith’s offense was especially heinous, atrocious, or cruel as compared to other capital offenses, the State argued that: Ms. Brooks was shot two times, first in the chest which rendered her helpless and then in the head; Smith attempted to shoot her a third time, but he ran out of bullets; when her attackers returned and found her alive, they picked her up; they then drove her around for long distances talking about burning her and refusing to take her for medical treatment; when they arrived at a desolate spot, they made her walk 100 yards with the codefendant carrying a gas can; they put a plastic bag over her head and suffocated her; while she was alive, they set fire to her. Likewise, the trial court reasoned as follows in finding the existence of the especially heinous, atrocious, or cruel aggravating circumstance:
“ ‘If Kimberly Brooks had died when Corey Schirod Smith shot her, and he had simply returned and burned her dead body, this would not have constituted the aggravating circumstance heinous, atrocious, and cruel as compared to other capital offenses. Suffice it to say that that is not the way it happened. Corey Schi-rod Smith found the victim alive when he returned to burn her body. Indeed, according to the undisputed medical evidence from the medical examiner, with proper treatment, Kimberly Brooks might very well have survived the initial shooting. She asked to be carried to a hospital. Instead, the defendant drove her around, looking for the appropriate place to finish her off. She was conscious, and there was no reason why she could not hear the discussions among the defendants that would have clearly evidenced their intent to kill her. After the long ride, she was pulled from the car and required to walk to the place of her doom. There is nothing to suggest that she did not know where she was going and why she was being taken there. Asphyxiation was the chosen method for finishing the job. The victim struggled for life and breath. Corey Schirod Smith enlisted the help of his accomplice to hold her hands, while he placed the plastic bag over her head. The victim slowly lost strength and consciousness, deprived of air. The Court has no way of knowing, of course, whether the victim had completely lost consciousness before she was doused with gasoline and set on fire. The Court has no way of knowing whether, in that terrible moment, she regained consciousness amidst the flames.
“ ‘Under Alabama law, only pre-mortem circumstances are taken into account in determining whether a killing is heinous, atrocious, and cruel as compared to other capital murders. The mere recounting of the circum *241 stances of this horrible killing placed it well within that category of cases which deserves the adjectives contained in this particular aggravating circumstance. The killing was heinous; it was atrocious; and it was cruel by any possible meaning that can be ascribed to those terms. The undersigned judge has dealt with capital charges against probably 15 defendants. Unquestionably, in comparison to all of the other capital offenses dealt with by this judge, this particular killing was especially and particularly heinous, atrocious, and cruel.’
“The Alabama Court of Criminal Appeals held that the trial court ‘properly found ... that the murder was especially heinous, atrocious, or cruel compared to other capital offenses.’ Smith, 797 So.2d at 547.
“Because the trial court’s finding of the existence of the especially heinous, atrocious, or cruel aggravating circumstance was strongly supported by the evidence that was presented at his trial, Smith’s counsel had no reason to argue that there was insufficient evidence to support the finding of that aggravating circumstance. Counsel will not be found ineffective for failing to raise a meritless issue at trial or on appeal. See e.g., Bearden [v. State], 825 So.2d [868] at 872 [ (Ala.Crim.App.2001) ]; Hubbard [v. State ], 584 So.2d [895] at 912 [ (Ala.Crim.App.1991) ]. For that reason, Smith cannot satisfy his burden of proving deficient performance and prejudice, under Strickland, with regard to his claim that his counsel were ineffective for failing to argue that the evidence was insufficient to support the finding of that aggravating circumstance. Smith’s claim is, therefore, denied, under Rule 32.7(d) of the Alabama Rules of Criminal Procedure.”
(Supp. R. 124-28.) The circuit court’s findings are supported by the record and by caselaw.
In determining the application of this aggravating circumstance “we must consider whether the violence involved in achieving the killing went beyond what was necessary to cause death, whether the victims experienced appreciable suffering after a swift assault, and whether there was psychological torture.” Brownfield v. State, 44 So.3d 1, 41 (Ala.Crim.App.2007).
“One factor this Court has considered particularly indicative that a murder is ‘especially heinous, atrocious or cruel’ is the infliction of psychological torture. Psychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture ‘must have been present for an appreciable lapse of time, sufficient enough to cause prolonged or appreciable suffering.’ Norris v. State, 793 So.2d 847, 861 (Ala.Crim.App.1999).”
Ex parte Key, 891 So.2d 384, 390 (Ala.2004). See Ex parte Rieber, 663 So.2d 999, 1003 (Ala.1995). “[E]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, or cruel.” Ex parte Rieber, 663 So.2d 999, 1003 (Ala.1995). See also Chavez v. State, 832 So.2d 730, 765 (Fla.2002) (“ ‘In numerous cases the Court has held that this aggravating factor [that the offense was heinous, atrocious, or cruel] could be supported by evidence of actions of the offender preceding the actual killing, including forcible abduction, transportation away from possible sources of assistance and detection, and sexual abuse.’” (quoting Swafford v. State, 533 So.2d 270 (Fla.1988))).
By anyone’s definition, Kimberly Brooks’s murder was especially heinous, *242 atrocious, or cruel as compared to other capital murders. Smith and his two code-fendants, Sanjay Brooks and Shontai Smith, forced Brooks into their vehicle and drove her to an isolated area. Smith shot Brooks once in the chest and then in the head. They left her for dead. When they returned to dispose of her body they found Brooks standing by the road in a daze. They put Brooks in their vehicle and drove around discussing among themselves how they would kill her and then dispose of her body. Brooks begged to be taken to a hospital to get medical attention. Eventually they stopped the vehicle and Sanjay Brooks told Smith and Shontai Smith to “finish her off.” Smith poured gasoline over her and they put a bag over her head until she lost consciousness and then they set her body on fire. After the initial gunshots rendered Smith helpless to prevent her death she suffered great psychological torture as she listened to her abductors discuss how they were going to kill her and dispose of her body while she begged for medical attention. The violence inflicted on Brooks far exceeded that necessary to cause her death, and she suffered for an appreciable period of time. Counsel was not ineffective for failing to argue that the murder was not especially heinous, atrocious, or cruel as compared to other capital murders. “Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue.” Lee v. State, 44 So.3d 1145, 1173 (Ala.Crim.App.2009). See James v. State, 61 So.3d 357 (Ala.Crim.App.2010); Davis v. State, 9 So.3d 539 (Ala.Crim.App.2008).
For the foregoing reasons, we affirm the circuit court’s denial of Smith’s postconviction petition.
AFFIRMED.
WELCH, P.J., and BURKE and JOINER, JJ„ concur. WINDOM, J., recuses herself.

. According to an order issued by the Alabama Supreme Court on July 1, 2002, clarifying its order of March 22, 2002, amending Rule 32.2, Ala. R.Crim. P., which changed the limitations period from two years to one year, Smith had two years from May 11, 2001, in which to file his petition.

. At the second evidentiary hearing, the circuit court incorporated the testimony from the first hearing that had been held in 2005; therefore we have taken judicial notice of our records in case no. CR-05-1253, 961 So.2d 916 (Ala.Crim.App.2006). See Nettles v. State, 731 So.2d 626 (Ala.Crim.App.1998).

. Dr. Golden testified:
"Executive functioning is a very broad term that represents a whole series of skills that generally develop later in life, in adolescence and early adulthood. These skills involve flexibility, planning, organizational skills, insight, ability to anticipate consequences of behavior, ability to solve problems that you have not been exposed to before, to come up with unique solutions and unique ideas to control emotions and stress, to — to overall coordinate the effective running of the adult brain.”
(Supp. R. 169.)