[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13583

_____

COREY SCHIROD SMITH,

Petitioner-Appellant,

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 3:13-cv-00437-RAH-CWB

_____

Before JORDAN, LUCK, and ABUDU, Circuit Judges.

LUCK, Circuit Judge:

Corey Schirod Smith warned Kimberly Brooks, the mother of his then-one-year-old daughter, "If you ever leave me, I'll kill you." He meant it. After learning that Ms. Brooks was living with another man, Smith kidnapped her at gunpoint, shot her in the chest and head until he ran out of ammo, and left her for dead in the woods beside an old dirt road. Then, after discovering that Ms. Brooks survived the gunshots, he tried to suffocate her with a trash bag, doused her in gasoline, and burned her alive in a pile of trash.

Smith was convicted and sentenced to death for murdering Ms. Brooks. He now appeals the denial of his petition for a writ of habeas corpus under 28 U.S.C. section 2254, claiming that his trial counsel were ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for failing to investigate evidence of his mental health problems. After careful review of the briefs and the record, and with the benefit of oral argument, we affirm.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. *The Murder*

Ms. Brooks was a senior at Tallassee High School in Tallassee, Alabama. On the morning of February 22, 1995, as she was putting her daughter, Labreasha Smith (Brea), in her car, Ms. Brooks noticed her neighbor and schoolmate trying to catch

the bus.  Ms. Brooks offered her schoolmate a ride to school in her car.

On their way to Tallassee High, Ms. Brooks stopped to visit Brea's father—Smith.  She went inside Smith's house with Brea, while her schoolmate went to visit his aunt's house nearby until Ms. Brooks was ready to head for school.  But hour after hour passed, and Ms. Brooks never picked up her schoolmate from his aunt's house.

Smith had learned that Ms. Brooks was in a relationship with another man and that she and Brea were living with him.  To make good on his threat that he'd kill her if she ever left him for another man, Smith spoke with his cousin, Sanjay Brooks (no relation to Ms. Brooks).  Sanjay drove over to Smith's house in his mom's van and brought another one of Smith's cousins, Shontai Smith.[1]

In the meantime, while Smith was waiting at his house for his cousins and the van, he started arguing with Ms. Brooks about their relationship.  They continued arguing outside, where Smith pulled out his .380 handgun and pointed it at Ms. Brooks.  "[W]henever" Smith argued with Ms. Brooks, as he himself put it, he would "always pull a gun on her and take her somewhere and talk" before "let[ting] her go."

But Smith told his cousins "this time [wa]s for real."  Once Smith's cousins pulled up at his house in the van, he pulled the gun

---

[1] Because Smith's cousins (and his father, Robert Charles Smith) share their last name with him and the victim, we refer to them by their first names.

on Ms. Brooks and forced her inside it.  Smith initially told his cousins to drive the van to an abandoned house, before changing course and telling them to head for a secluded area locally known as "Bibb Town."  They stopped the van on a dirt road leading to a dump, where people left trash like old household items and building materials.  Sanjay and Smith exited the van, and Sanjay pulled Smith aside, asking to take Smith back home because he should "not . . . be doing this."  But Smith wouldn't listen.  Instead, he went back to the van and, still holding his .380, demanded that Ms. Brooks step out of it.

After Ms. Brooks left the van, Smith got angry with her again, arguing with her about their relationship like he had done at his house.  He insisted that he "love[d] her" and that "if [he] couldn't have her[,] no one could."  But Ms. Brooks told Smith that, although she loved him too, "things weren't the same" anymore.

That was when Smith had heard enough.  He embraced Ms. Brooks, kissing her on the forehead, before pushing her off of him.  He raised the .380 to her chest and told Sanjay to stand back.  Then he fired.  After Ms. Brooks fell to the ground, clinging to her chest, Smith walked over and shot her again in the head.  And he kept pulling the trigger trying to shoot her, over and over, but the gun wouldn't fire after the second shot.

Thinking that Ms. Brooks was dead, Smith and Shontai grabbed Ms. Brooks by her feet and dragged her body away from the dirt road, leaving her in the woods.  Smith left with his cousins and told Shontai he needed gasoline to burn Ms. Brooks's body.

After finding some money to buy the gasoline, Smith went to a nearby gas station and bought enough to fill a jug.

Night had fallen by the time Smith and his cousins drove back to the dirt road with the jug of gas. As they were heading back down the dirt road, they saw, to their surprise, Ms. Brooks—standing on the side of the road, bending over. They stopped by Ms. Brooks to let her in, and she sat beside Smith. Smith started asking her questions, like if she knew who he and his cousins were and if she knew what happened to her head. He also asked her if she wanted to go to the hospital and, if she did, how she would describe what happened to her. Ms. Brooks answered that she wanted to go to the hospital and that she'd tell them "Corey shot me."

Instead of taking Ms. Brooks to the hospital, Smith—in front of Ms. Brooks—plotted with his cousins on where they should kill her and dispose of her body. Smith initially instructed his cousins to drive to the next town over from Tallassee, Reeltown, because they could burn Ms. Brooks's body behind a relative's house, talking "about how much grass was around there and saying you've got to walk to get back there." But Smith ditched that plan once they got to the house after seeing its lights were on. Undeterred, Smith told his cousins—with Ms. Brooks still in the car—to go back to the dirt road.

That's what Smith and his cousins did, driving back to the dirt road before stopping not far from where Smith shot Ms. Brooks. Smith demanded that Ms. Brooks get out, but she

6               Opinion of the Court               23-13583

refused.  Smith told Shontai to get her out of the van, and he pulled her out of it by her arm.  After pulling Ms. Brooks out, Shontai grabbed the jug of gas, plus a trash bag that they had in the van. Ms. Brooks asked Smith if she could lay down, but he wouldn't let her.

With Shontai carrying the gas and trash bag, Smith held Ms. Brooks's hand and led her about a hundred yards down the dirt road, until they reached the trash dump site.  That's when Smith asked Shontai to hand over the trash bag.  Smith put the trash bag over Ms. Brooks's head to suffocate her.  Ms. Brooks fought back, and Smith asked Shontai to hold her hands to stop her.  After Shontai stepped in, Ms. Brooks again fell to the ground.

For a second time, Smith thought that he had successfully killed Ms. Brooks.  To get rid of her body, he took the jug of gasoline and lighter from Shontai, poured the gasoline on Ms. Brooks, and set her on fire.  Once the fire started spreading out of control to the nearby trash, Smith and Shontai started throwing dirt on Ms. Brooks trying to put the fire out.  They kept picking up dirt and throwing it on her until the fire finally went out.  And then Smith told Shontai to find something to wrap Ms. Brooks's body in. Shontai picked up some carpet from the dump site, and he and Smith rolled it out, put Ms. Brooks's body on it, wrapped her, and then left.  As they left, Smith threw the .380 on the ground next to Ms. Brooks.

The next day, February 23, Smith called Ms. Brooks's mom. Smith asked her if she had seen her daughter, saying that

Ms. Brooks had brought Brea over to his house that morning before leaving in someone's maroon car. Concerned, Ms. Brooks's mother called the cops and went to Smith's house. When she got there, Smith repeated his story for what happened—that Ms. Brooks left in a maroon car. He gave a similar story to one of Ms. Brooks's friends and the cops, but identified the car as a red Beretta. Smith also told Sanjay that "if anybody asked, . . . tell them that the lady in the red Beretta came and picked [Ms. Brooks] up at the corner store."

But, when Smith was interviewed by officers on February 24, he waived his *Miranda*[2] rights and wrote a detailed confession—explaining how he shot Ms. Brooks, tried to suffocate her, and then burned her. Officers later found Ms. Brooks's body, and an autopsy revealed fluid accumulation in her lungs, along with soot lining the lungs' airways—indicating that Smith burned Ms. Brooks alive and she was breathing in the smoke.

### B.  Penalty Phase

On May 10, 1995, an Alabama grand jury indicted Smith for murdering Ms. Brooks in the course of a kidnapping, in violation of Alabama Code section 13A-5-40(a)(1), a capital offense. After he pleaded not guilty, the state trial court set the trial for August 28, 1995. The trial lasted five days, and the jury found Smith guilty as charged in the indictment.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

### 1.  Penalty Phase Evidence

The penalty phase began on September 2, the day after the jury returned its verdict.  During the penalty phase, trial counsel presented sixteen witnesses to testify on Smith's behalf.

#### a.  *Emma Forte*

Smith's mother, Emma Forte, told the jury about Smith's upbringing.  When Smith was younger, she explained, "he was different.  He didn't talk."  "And as he grew older[,] he still had a speech problem . . . [,] till [sic] he was about six or almost seven."  His speech problem was "[k]ind of like a stutter," and other kids gave him a hard time over it.  Although Smith's speech got better as he grew older, his speech problem caused him to "go into his shell" for "[b]asically all his life."

Smith's father, Robert Charles Smith, was mostly absent—he didn't support Ms. Forte or her kids financially, and Ms. Forte regularly called child support services and went to court "all the time" to get him to pitch in.  The most he ever contributed was "$10 a month."  Robert Charles denied that he was Smith's father altogether until Smith was five or six.

Besides taking Robert Charles to court over his lack of financial support, Ms. Forte also took legal action against him for being violent toward her.  There was one incident where he cut Ms. Forte with a knife, scarring her, which Smith wasn't present for.  And there was another incident where Ms. Forte was home with Smith and his brothers, and Robert Charles showed up with a gun.  Ms. Forte told the kids to go in their room and shut the door.

As for Smith's parenting of Brea, Ms. Forte described how, although she helped take care of Brea on weekends, Smith took care of her when she had to work or was sick. Smith didn't have a job, but he told Ms. Forte that he had started taking classes to prepare for the GED so that he could get a job and "be a better father."

### b. Smith's Stepparents

Both of Smith's stepparents—Jelma Smith (his stepmom) and Casbie Forte (his stepdad)—also testified. Ms. Smith went first, and she repeated that Smith had speech problems as a child—"he used to stutter" and "didn't talk plain," "[e]ver since he first started talking." Other kids "mocked him" for it. But Smith was "more talkative" with Brea and "didn't ask nobody else" for help cleaning or feeding her.

Mr. Forte echoed that Smith was a "[k]ind of quiet" kid, "shy like," and he was bullied for his speech problems. But, Mr. Forte testified, Smith grew up to be a caring father to Brea—"[n]ormally [his] job was to give her a bath and feed her and get her dressed for bed and play with her." Smith unsuccessfully interviewed for several jobs after Brea was born to "take care of his kid."

### c. Smith's Siblings

Four of Smith's siblings—Reginald Smith (brother), Katrine Smith (half-sister), Chowon Smith (half-brother), and Latrice Smith (half-sister)—gave testimony that was similar to the stepparents' testimony. Reginald testified that he "never" heard Smith refer to Robert Charles as his "[f]ather." As for Smith's parenting of Brea, Reginald explained that Smith, after finding out Ms. Brooks was

living with another man, "didn't like the idea of another man trying to raise his child."

According to Katrine, before Brea was born, Smith was "going through a depression," but after Brea was born "he often talked about how he would change his life for his child." Smith told Katrine that "he felt like he was losing his child" to Ms. Brooks's new boyfriend.

Chowon helped Smith study for his GED test. When Chowon saw Smith outside of studying, he regularly saw him playing with Brea, "like he'd have her in the bed or something[ and] she'd be jumping around or whatever."

Latrice saw Chowon and Smith studying for the GED together; Smith would ask Chowon questions and they'd discuss practice test answers. Latrice also described one time where her brother wanted Smith to visit and play video games, but Smith refused "because he was going to keep his baby."

### d. Aunt, Uncles, and Cousins

Five other family members testified for Smith—the Butlers (Annie Butler, aunt; Larry Butler, Sr., uncle; and Latasha Butler, cousin), Merrell Hayes (cousin), and Jerry Lewis Terrill (uncle).

Ms. Annie Butler frequently talked to her sister, Ms. Forte, about the "troubles" she had with Robert Charles. There was one incident in May 1981, when Smith was fifteen, where Ms. Forte attended a baseball game at a local recreation center, and Robert Charles showed up and pulled a gun on her. Ms. Butler had also

seen Robert Charles pull a gun on Ms. Forte at Ms. Forte's home. And, another time when Ms. Forte was visiting Ms. Butler's trailer, Robert Charles fired a gun into the trailer after demanding that Ms. Forte come outside.

Mr. Butler was at the ballpark when Robert Charles threatened Ms. Forte with the gun. He suspected that Smith heard about the incident, but he didn't think that Smith actually saw it.

Ms. Latasha Butler, a sixth grader at the time, testified that she was close to Smith, that Smith was good at making Brea stop crying, and that Brea meant "[a] lot" to him.

Mr. Hayes explained that Smith "was a child that was born into a not-so-desirable social setting," but Smith attended Sunday school at Mr. Hayes's church until he was around twelve. Considering what he saw at the May 1981 ball game—Robert Charles threatening Ms. Forte with the gun, yelling "I just ought to kill you; I ought to kill you"—he thought that Smith grew up in a "very violent domestic situation."

When Mr. Terrill testified, he gave his own observations of Smith as a father to Brea, such as one time when he saw Smith "trying to teach her how to say fish" while looking at an aquarium. Smith had told Mr. Terrill that "he didn't want nobody else to raise his kid because they wouldn't raise [her] like he would."

### e.  Community Members

As for the last of the witnesses, Smith's trial counsel called four people from the Tallassee community who knew Smith—

Herbert Woodruff, Arlene Hooks, Rebecca Taunton, and James Coan.

Mr. Woodruff was a store manager for the Tallassee Wal-Mart. He testified that Smith applied for a job at the store back in 1994, but that was all he knew about Smith.

Ms. Hooks knew Smith because she was dating one of his brothers. She gave more details about Smith taking care of Brea, testifying that she helped teach Smith "how to warm her bottles up, how to change her Pamper[s], how to burp her, how to put her clothes on, [and] how to bathe her."

Ms. Taunton was a local high school teacher who had Smith in the ninth and tenth grades. In his tenth grades classes with Ms. Taunton, Smith "sat in the back of the classroom" and usually kept "his head on his desk"; he "did not talk very much."

Finally, Mr. Coan was Smith's little league baseball coach when Smith was ten. Despite Smith being "very quiet," he "made All Stars" and was a "[v]ery hard worker."

### f.    Other Evidence

Besides the witness testimony, Smith introduced several records into evidence: court records corroborating that Smith's father was violent toward Ms. Forte; state agency records indicating that Smith's father provided little, if any, financial support to Ms. Forte when Smith was growing up; and Smith's GED test results (he failed).

The state, for its part, presented one witness—Ms. Brooks's mother—who testified that she had been taking care of Brea since the murder.  Before the murder, she testified, Smith did not help her or Ms. Brooks take care of Brea nor provide them any financial support.

After considering all of the evidence, the jury, by a vote of twelve to zero, recommended that Smith be sentenced to death.

### 2.  The Sentencing Hearing

Two weeks later, on September 14, the state trial court held a hearing to impose Smith's sentence.

The state trial court began by finding that the state had proven two aggravating factors beyond a reasonable doubt, which "carr[ied] great weight":  (1) Smith committed murder while engaged in the act of kidnapping in the first degree, *see* Ala. Code § 13A-5-49(4); and (2) the murder was particularly heinous, atrocious, and cruel when compared to other offenses, *see id.* § 13A-5-49(8).  Smith committed murder while engaged in a kidnapping, the state trial court explained, because he abducted Ms. Brooks when he forced her into the van at gunpoint and took her to Bibb Town to kill her.  Then, he abducted Ms. Brooks again after finding that she survived the gunshots, driving her around for "a number of miles" before forcing her to walk a hundred yards to the dump site.

As for why Smith's murder was particularly heinous, atrocious, and cruel, the state trial court explained that besides shooting Ms. Brooks twice, Smith returned to find her alive and passed on

the chance to save her life by taking her to the hospital. Then he drove around with his cousins with Ms. Brooks in the car, while she was listening to Smith discuss where they should kill her and burn her body. "She was conscious, and there was no reason why she could not hear the discussions" Smith was having with his cousins. And, "[a]fter the long ride, she was pulled from the car" and Smith forced her to walk a hundred yards to the trash dump, where Smith suffocated her with a plastic bag before pouring gasoline on her and burning her alive.

Turning to the mitigating circumstances, the state trial court found that Smith had proven two statutory ones: (1) he had no significant history of prior criminal activity (which the state trial court found was "extremely weak"); and (2) he was eighteen at the time of the murder ("weak"). *See* Ala. Code § 13A-5-51(1), (7). It separately found that two statutory mitigating circumstances relating to Smith's mental health didn't apply: (1) the murder was committed under the influence of extreme mental or emotional disturbance; and (2) Smith's capacity to appreciate the criminality of his conduct and conform it to the law was substantially impaired.[3] *See id.* § 13A-5-51(2), (6).

---

[3] The state trial court concluded Smith failed to establish three other statutory mitigating circumstances: (1) the victim participated in the conduct and consented to it (Ms. Brooks clearly did not consent to being kidnapped and murdered); (2) relatively minor participation (Smith "was the primary mover in all of the events"); and (3) the murder was motivated by extreme duress or the

As for the extreme mental or emotional disturbance factor, the state trial court explained that "[t]here was no expert testimony that tended to show [Smith] was under the influence of extreme [mental] or emotional disturbance," nor any expert testimony that he was mentally ill.  But, the state trial court acknowledged, the evidence "probably point[ed] to the conclusion that [Smith] was experiencing considerable emotional distress because of his relationship with [Ms.] Brooks."  To the extent he was "experienc[ing] some degree of emotional distress," that fact was entitled to "little or no weight" because "emotional distress of this type is the fertile and frequent breeding ground for criminal intent."

Then, as for Smith's ability to appreciate his conduct's criminality and conform it to the law, his "initial denial of his involvement in the killing, his construction of an alternative theory for her disappearance, [and] his concoction of a story . . . of a red Beretta," all showed that he appreciated that his conduct was criminal.

In addition to the statutory mitigating circumstances, the state trial court found Smith had proven several non-statutory mitigating circumstances, but these circumstances were entitled to little mitigating weight, if any:  (1) Smith's father, Robert Charles, abused his mother by cutting, shooting, and fighting with her; (2) Smith was bullied when he was young for having a speech impediment, which caused him to be withdrawn and quiet; (3) he was a good baseball player when he was nine or ten; (4) he made some

---

substantial influence of another person (there was "no support" for this factor). *See* Ala. Code § 13A-5-51(3)–(5).

effort, but not a substantial or material effort, to maintain a relationship with Brea and support her, like by applying for jobs and taking the GED; (5) he confessed to the murder within twenty-four hours and helped authorities find Ms. Brooks's body; and (6) his family and members of the community loved and cared for him.

After weighing the aggravating factors against the mitigating circumstances, and taking the jury's recommendation into account, the state trial court found that the aggravating factors "far outweigh[ed] the mitigating circumstances." Thus, it sentenced Smith to death.

Smith appealed his conviction and death sentence to the state appellate court, which affirmed. *Smith v. State*, 797 So. 2d 503, 548 (Ala. Crim. App. 2000). Both the Alabama Supreme Court and United States Supreme Court denied Smith's petitions for a writ of certiorari. *Ex parte Smith*, 797 So. 2d 549 (Ala. 2001); *Smith v. Alabama*, 534 U.S. 962 (2001).

## C. State Habeas Proceedings

Smith moved for postconviction relief under Alabama Rule of Criminal Procedure 32. He alleged that his trial counsel were constitutionally ineffective under *Strickland* for failing to investigate evidence of his mental health problems at the time of the murder. Those problems, Smith asserted, were that he had "[p]ost-[t]raumatic [s]tress disorder . . . associated with abuse and neglect during childhood," "[p]oly-[s]ubstance [a]buse," "frontal and temporal lobe impairment, brain damage[,] and a mood disorder." Smith contended that his trial counsel found "red flags" indicating

that he had these problems, like a report that he "had seen a psychiatrist in his early adolescence" and "complained of 'mental problems' while in pre-trial detention," but "did nothing with this information" and failed to present any expert witnesses. And, "[a]t the time of the offense, . . . Smith suffered from a family history that included inter-generational violence," such as his father's abuse of his mother.

### 1. The Evidentiary Hearings

The rule 32 court held two evidentiary hearings on Smith's postconviction motion, where he and the state both presented evidence about his upbringing and expert testimony about how it affected his mental health.

### a. Smith's Trial Counsel

Both of Smith's trial attorneys—Palmer Singleton and Lee Sims—testified that they did not consult any experts about Smith's mental state during the crime, and they generally didn't investigate whether Smith's judgment was impaired by his substance abuse, extreme emotional distress, post-traumatic stress disorder, or other psychological impairments. Mr. Sims added that, when he first met Smith, "[Smith] didn't seem right" because "[Smith] didn't connect with the facts of the world and the reality he was in."

### b. Ms. Hammock

Ms. Hammock was a clinical social worker. She performed a biopsychosocial assessment on Smith, which "is a professional social work tool for gathering information on a [subject]," like

"information about the biological or physical, the psychology or behavioral, and social history" of the subject.  Her assessment included interviewing twenty-seven people who knew Smith as he was growing up, like friends and family.  It also included reviewing Smith's school, medical, and legal records.

Based on her assessment, Ms. Hammock opined that Smith came from a background of "considerable violence, deprivation, family patterns of violence toward each other . . . , considerable poverty, lack of resources for the family to survive, and a generational pattern of difficulties in meeting basic needs"—all of which negatively impacted his development.  Starting with Ms. Forte's pregnancy with Smith, Ms. Hammock explained that Ms. Forte "drank and smoked continuously throughout . . . [Smith's] gestation."  And Smith had a rough birth—"[i]t was a forceps delivery," he was "on the borderline of underweight[,] [t]he umbilical cord was wrapped around [his] head times four," and "[i]t [wa]s suspected that there was some trauma connected with th[e] particular delivery."

After Smith was born, he grew up in a home without enough food to go around between him and his brother.  He was also slow to develop—for example, he sat up late, "[w]as slow to walk," and his speech was "difficult."  "[T]here [we]re frequent fights" between his mom and dad, which included "some shootings[ and] some stabbings" that Smith didn't witness, and more fights between his mom and father.  There were times where Ms. Forte was physically and verbally abusive to Smith, calling him

names and yelling epithets at him. She hit Smith "with anything she could get her hands on," like an iron cord. Smith was also beaten by his brother.

According to Ms. Hammock, around when Smith turned nine, and into his teen years, Smith turned to substance abuse. He started out drinking beer and rum before opting for wine, and he was drinking daily at school by the time he was thirteen. Smith also picked up smoking marijuana that he laced with embalming fluid and crack cocaine, in addition to snorting cocaine. During this period of substance abuse, he struggled with his fine motor skills, sleeping, and academics.

### c. Dr. Maher

Dr. Maher testified that he performed a mental health examination of Smith in June 2002. As part of his examination, Dr. Maher "did a psychiatric interview and history[,] as well as a psychiatric exam," and "review[ed] a substantial quantity of records related to past history, including medical records, school records, legal records, and social service or social environment records." He also reviewed the tests and findings of the other experts, like Ms. Hammock's findings about Smith's background.

Based on the evaluation, Dr. Maher opined that Smith "suffer[ed] from a variety of impairments" in 1995: post-traumatic stress disorder, poly-substance abuse, "brain impairments associated with diffuse brain damage or abnormalities that were present at birth," and "a frontal lobe syndrome affecting executive functioning." As for what caused these conditions, Dr. Maher pointed

to Ms. Forte's drinking while pregnant, which "is an absolutely proven cause of brain damage," Smith's rough birth, his being exposed to domestic violence, his adolescent substance abuse, and his academic failures. Dr. Maher also agreed that the fact that Smith inhaled gasoline fumes could cause brain damage.

Smith's conditions, in Dr. Maher's view, impaired his judgment in 1995, his ability to appreciate the wrongfulness of murdering Ms. Brooks, and his ability to conform his behavior to the law. They also hindered Smith's emotional development, making him "much less mature" than his actual age in 1995 (eighteen) would've indicated. Specifically, Dr. Maher thought that Smith "was functioning at the level of a child of preadolescent or early adolescent age, [twelve] to [fourteen] years of age."

### d.  Dr. Golden

Dr. Golden, a psychologist, "did a series of psychological and neuropsychological tests" in October 2003, "aimed at evaluating the main areas of attention, memory and executive function, as well as personality functioning in . . . Smith." For example, he administered the Wechsler Adult Intelligence Test and the Rorschach ink blot test. And, like Dr. Maher, Dr. Golden also reviewed various records and Ms. Hammock's findings.

As for what his evaluation showed, Dr. Golden opined that "Smith's brain [wa]s functioning at a borderline level with particular deficits in terms of academic reading skills and arithmetic skills and in terms of executive functioning," including in 1995. Dr. Golden explained that "executive functioning" is "a very broad

term that represents a whole series of skills that generally develop later in life," like planning, organization, flexibility, insight, "ability to anticipate consequences of behavior," solving unfamiliar problems, and coming up with unique ideas. "[O]verall," it refers to "the effective running of the adult brain" and the presence of these skills captures "[t]he difference between an adult and a child." And "borderline" refers to "someone who is not normal" "in terms of intelligence," but not to the point that he's mentally disabled.

Dr. Golden thought that, in 1995, Smith's psychological impairments affected his judgment, diminished his ability to conform his conduct to the law and control impulses, and hindered his ability to recognize the consequences of his actions. Similar to Dr. Maher, Dr. Golden also concluded that, although Smith was eighteen in 1995, "[h]e would have been functioning emotionally from a frontal lobe point of view like a [ten-] to [twelve]-year-old." "And even that," Dr. Golden continued, "[wa]s a conservative estimation of the impact of the damage."

### e.  Dr. King

For its part, the state presented Dr. King, a clinical psychologist. Dr. King evaluated Smith in May 2005, through a two-day clinical interview that lasted four or five hours each day. He administered the Halstead-Reitan Neuropsychological Test Battery, a series of tests that "look at what kind of cognitive functions remain," and the Wide Range Achievement Test, a screening device used to gauge one's academic performance level. Dr. King also reviewed a variety of records, such as the trial transcripts and Smith's

confession, school records, and the records relied on by the other experts.

As part of the Halstead-Reitan battery, Dr. King administered the Wechsler Adult Intelligence Test. Dr. King explained that, although the results of his administration of the test appeared similar to those from Dr. Golden's, the results were not "basically the same" because Dr. King thought Smith might've scored higher "in terms of IQ" on Dr. Golden's test "if some of the subtests had been administered correctly."

To gauge Smith's cognitive and executive functioning, Dr. King administered the Tactual Performance Test, which included requiring Smith to connect circles in a certain sequence as fast and mistake-free as possible. This test, according to Dr. King, is a "valid, reliable measure of executive functioning and relate[s] well to identifying brain impairment." Smith "did very well" and scored "within normal limits."

Unlike Dr. Golden, Dr. King did not administer the Rorschach ink blot test. In Dr. King's view, the Rorschach test is not a valid or reliable test for assessing extreme emotional distress, diffuse brain dysfunction, post-traumatic stress disorder, depression, or poly-substance abuse. Even putting that aside, Dr. King opined that Dr. Golden did not record the test results properly because there was no record of Dr. Golden inquiring about Smith's responses. Dr. King didn't "have [the] foggiest notion how he scored it."

Dr. King also "found [a] number of inconsistencies" in Ms. Hammock's findings. Although Ms. Hammock concluded that "Smith was the product of poverty and chaos and his home life was bad, [and he] had no access to resources for mental health, medical treatment, things of that nature," Ms. Hammock also found that Smith regularly took headache medication, "had his own bedroom in his own house," and had access to "a dirt bike and a four wheeler, which doesn't sound like poverty." Ms. Hammock further noted that Smith was taken to doctors "numerous times" for things like fevers and earaches, "which also sounds like he certainly had access to parental support for getting medical treatment."

"[O]verall," Dr. King concluded that Smith "functions in the low-average to high-borderline range of intellectual ability." He "found no real evidence for any kind of focal brain damage or anything like that by history, by [Smith's] reports, or by [Smith's] test data." And he expressly "disagree[d]" with any diagnosis of frontal or temporal lobe damage to Smith's brain because he "found no evidence to indicate frontal or temporal lobe damage or any kind of brain damage." Dr. King "d[id]n't necessarily agree" with the statement that the cumulative effect of multiple head injuries could cause brain damage.

Instead, Dr. King's findings indicated that Smith "has lower intellectual functioning with probably some dyslexia and some learning disabilities." "[O]therwise he is normal." Dr. King further opined that Smith does not have post-traumatic stress disorder and didn't have it at the time of the offense. Dr. King explained that

the disorder's onset is caused by a "traumatic event" like a death or threat of death or serious injury. But Dr. King "kn[e]w of no circumstance" that could be so traumatic. He acknowledged that Smith may have been exposed to others' abuse when younger, but emphasized that "[i]t ha[d] to arise to the level of death or threatened serious physical injury." He also explained that neither Smith nor anyone else reported that Smith suffered the disorder's symptoms, like "persistent reliving of . . . the traumatic event" and "avoidance" of the area where it occurred.

Dr. King acknowledged that Smith had some "substance abuse issues" at the time of the murder. But, in his view, Smith's drug and alcohol use did not impair his ability to appreciate the wrongfulness of his conduct. Nor did Smith lack the ability to appreciate the wrongfulness of his crime, generally.

To be sure, Smith was "probably" immature for his age at the time of the offense, but Dr. King was "not sure [he] would agree with" Dr. Maher's conclusion that Smith was emotionally immature at that time. Smith "may have been suffering" from "some [emotional] distress" around the time of the murder, too, but Dr. King was "not sure" that he'd categorize it as "extreme."

### f.   Smith's Former Teachers

The state also presented two of Smith's former teachers—Karen White and John Wilcox—who testified about their observations of Smith when he was in school. Ms. White was Smith's English teacher in middle school. She testified that she didn't remember Smith ever coming to class with visible bruises or broken

bones, and she never suspected that he was being abused. She also never saw Smith drink alcohol at school or appear intoxicated.

Mr. Wilcox taught Smith's ninth grade Alabama history class. He remembered Smith attending class on a regular basis and didn't remember seeing any signs that Smith was being physically abused, or that Smith was abusing alcohol and drugs.

### 2. The Rule 32 Court Denied Smith's Motion for Postconviction Relief

After the evidentiary hearing, the rule 32 court denied Smith's motion for postconviction relief. It concluded that, even if trial counsel performed deficiently by failing to investigate evidence of Smith's mental health, the deficient performance didn't prejudice Smith's penalty phase result for two reasons.

First, the rule 32 court concluded there was no reasonable probability that Smith's mental health testimony from the rule 32 hearing would've altered the state trial court's balancing of the aggravating and mitigating circumstances because the testimony wasn't credible. The rule 32 court explained that it "[could ]not credit Dr. Maher's testimony that Smith was suffering from [p]ost-[t]raumatic [s]tress [d]isorder and brain damage at the time of the offense or Dr. Golden's testimony that Smith was suffering from brain damage at the time of the offense." That was because "Dr. King's testimony that Smith never has suffered from [p]ost-[t]raumatic [s]tress [d]isorder, functions in the high-borderline to low-average range of intellectual functioning, probably suffers from learning disabilities, and otherwise functions normally [wa]s

supported by the evidence in the record," so the rule 32 court "credit[ed] his testimony" instead.

Second, even putting aside the credibility problem, the rule 32 court concluded there was no reasonable probability that the mental health testimony (or additional evidence of Smith's background) would've made a difference "[i]n light of the brutal nature of the crime." The state trial court had found two significant aggravating factors, and "[e]vidence of [Smith's] alleged mental problems would not have altered, diminished, or undermined [them]."

### 3. The State Appellate Court Affirmed the Denial of Smith's Motion for Postconviction Relief

The state appellate court affirmed the rule 32 court's denial of Smith's motion for postconviction relief because, assuming his trial counsel performed deficiently in failing to investigate mental health evidence, "Smith failed to meet the prejudice prong of the *Strickland* test." *Smith v. State*, 122 So. 3d 224, 239 (Ala. Crim. App. 2011); *see id.* at 236–39. The state appellate court found that "the expert testimony concerning Smith's mental health was to a large extent controverted by [Dr. King]," *id.* at 238, who "disagreed with the major diagnoses expressed by Smith's experts," *id.* at 236. And to the extent that Smith's postconviction evidence "concern[ed] Smith's family and his upbringing," the state appellate court found that "[t]he vast majority of the testimony" was merely cumulative of testimony from "the [sixteen] witnesses who testified during the penalty phase." *Id.* at 238. Thus, in light of the significant aggravating circumstances found by the state trial court, the state

appellate court was "confident . . . that presenting evidence of Smith's mental health, which was in large part disputed by [Dr. King], and even more evidence of his upbringing, would ha[ve] had no impact on the result[] in the penalty phase." *Id.* at 239.

## D. *Federal Habeas Petition*

After unsuccessfully moving for postconviction relief in the state courts, Smith petitioned the district court for federal habeas relief under 28 U.S.C. section 2254. He alleged that the state appellate court's denial of his claim was based on two unreasonable determinations of the facts: (1) "the testimony of his mental health experts at the [rule 32] hearing was 'cumulative' of the testimony of the lay witnesses at the penalty [phase] hearing"; and (2) "the evidence from [his] mental health experts 'was to a large extent controverted'" by Dr. King's testimony. These two factual findings, Smith contended, caused the state appellate court to unreasonably apply *Strickland*'s prejudice standard when determining that there was no reasonable probability that the mental health experts' testimony would've undermined the aggravating circumstances.

The district court denied Smith's petition, beginning its analysis with the two allegedly unreasonable factual findings. As for the state appellate court's purported finding that the mental health testimony would've been cumulative of the penalty phase evidence, the district court explained that "Smith misread[] the [state appellate court]'s opinion." The state appellate court's

cumulativeness finding was limited to evidence *"concerning Smith's family and his upbringing"* presented during the rule 32 hearings, not about "the mental health experts' opinions regarding his mental health conditions."

As for the state appellate court's finding that Smiths' mental health experts' testimony was "to a large extent controverted" by Dr. King's, the district court concluded the finding wasn't unreasonable. Although the experts "may have agreed . . . about some matters," their "opinions about [the] alleged major mental health diagnoses were conflicting."

Because the state appellate court didn't unreasonably determine the facts, the district court applied Antiterrorism and Effective Death Penalty Act (AEDPA) deference to its overall determination that Smith failed to show *Strickland* prejudice. And that determination, the district court concluded, wasn't unreasonable considering the aggravating factors of Smith's crime.

Although the district court denied a certificate of appealability, we granted one as to whether the state appellate court unreasonably applied *Strickland* by determining that Smith suffered no prejudice from his trial counsel's failure to investigate his mental health problems.

## II.    STANDARD OF REVIEW

We review de novo a district court's denial of federal habeas relief. *Sears v. Warden GDCP*, 73 F.4th 1269, 1279 (11th Cir. 2023).

### III.    DISCUSSION

Because Smith's habeas claim was adjudicated on the merits by the state appellate court, we must review that court's decision under AEDPA's "'highly deferential' standards." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022) (en banc) (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015)). "Under those standards, we may not grant the writ unless the state court's 'adjudication of the claim . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law . . . ; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." *Id.* (quoting 28 U.S.C. § 2254(d)).

To show that a state court unreasonably applied clearly established federal law, the petitioner "must show far more than that the state court's decision was merely wrong or even clear error." *Id.* (quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2020)). Instead, he "must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn*, 592 U.S. at 118 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)); *cf. Harrington*, 562 U.S. at 102 ("If this standard is difficult to meet, that is because it was meant to be.").

"When it comes to factual determinations, '[s]tate court factfindings are entitled to a presumption of correctness unless the petitioner rebuts that presumption by clear and convincing evidence.'" *Pye*, 50 F.4th at 1034 (quoting *Conner v. GDCP Warden*, 784

F.3d 752, 761 (11th Cir. 2015)); *see* 28 U.S.C. § 2254(e)(1). And "even if a petitioner successfully carries his burden under [section] 2254(e)(1)—showing by clear and convincing evidence that a particular state-court factual determination was wrong—he does not necessarily meet his burden under [section] 2254(d)(2):" showing that "the state court's 'decision' was 'based on' an 'unreasonable determination of the facts.'" *Pye*, 50 F.4th at 1035 (quoting 28 U.S.C. § 2254(d)(2)).

On top of AEDPA's deferential standards of review, *Strickland* "itself places a demanding burden on a convicted defendant to show that he was prejudiced by his counsel's deficient performance." *Id.* at 1041. In the capital sentencing context, showing prejudice means establishing that, "absent [counsel's] errors," "there is a reasonable probability that . . . the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Thornell v. Jones*, 144 S. Ct. 1302, 1310 (2024) (quoting *Strickland*, 466 U.S. at 695). A "reasonable probability" is one that's "sufficient to undermine confidence in the outcome . . . [,] requir[ing] a substantial, not just conceivable, likelihood of a different result." *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)).

"Applying AEDPA to *Strickland*'s prejudice standard, we must decide whether the state [appellate] court's conclusion that [trial counsel]'s performance at the sentencing phase of [Smith]'s trial didn't prejudice him—that there was no 'substantial likelihood' of a different result—was 'so obviously wrong that its error

lies beyond any possibility for fairminded disagreement.'" *Pye*, 50 F.4th at 1041–42 (quoting *Shinn*, 592 U.S. at 118).

Smith contends that the state appellate court's decision—concluding that any deficient mental-health investigation by his trial counsel did not prejudice his penalty phase under *Strickland*—was *that* wrong, so we should review his claim de novo. But we disagree. The state appellate court didn't unreasonably find that Smith's expert mental health testimony was largely controverted by Dr. King's. And its determination that there was no reasonable probability of a different result had the controverted testimony been presented wasn't unreasonable.

## A. The State Appellate Court Didn't Unreasonably Find That Evidence of Smith's Family and Upbringing was Merely Cumulative of His Lay Witness Testimony

As a threshold matter, Smith maintains that the state appellate court unreasonably determined the facts by finding that evidence of his mental health impairments was "merely cumulative" of his lay witness testimony during the penalty phase. But we agree with the district court that the state appellate court made no finding that the postconviction evidence of his mental health impairments was "merely cumulative" of the lay witness testimony. Instead, the state appellate court found that "[t]he vast majority of the testimony concerning Smith's *family and his upbringing*"—not his mental health—was merely cumulative of the lay witness testimony. *Smith*, 122 So. 3d at 238 (emphasis added). As for that finding, we cannot say it was clearly and convincingly wrong

considering the extensive testimony from the sixteen lay witnesses about Smith's upbringing.

### B.  *The State Appellate Court Didn't Unreasonably Find That Smith's Expert Testimony Was Largely Controverted by Dr. King*

The state appellate court began its *Strickland* prejudice analysis by finding that Smith's expert mental-health testimony from the rule 32 hearing "was to a large extent controverted by [Dr. King's]."  *Id.*  We cannot say this finding was clearly and convincingly wrong (or, for that matter, unreasonable).  *See* 28 U.S.C. § 2254(d)(2), (e)(1); *Pye*, 50 F.4th at 1034–35.

After evaluating Smith, Dr. Maher opined that, in 1995, Smith suffered from post-traumatic stress disorder, poly-substance abuse, and "diffuse brain damage," contributing to Smith's "frontal lobe syndrome affecting executive functioning."  These conditions, in Dr. Maher's view, impaired Smith's judgment leading up to the murder, made him unable to appreciate the wrongfulness of murdering Ms. Brooks, and hindered his ability to conform his behavior to the law.  They also made Smith "much less mature" than his actual age of eighteen—more like a child of "[twelve] to [fourteen] years of age."

Similarly, Dr. Golden, after administering tests like the Wechsler Adult Intelligence Test and Rorschach ink blot test, opined that Smith's brain functioning was "borderline"—or "not normal in terms of intelligence"—with particular deficits in his executive functioning.  These deficits, according to Dr. Golden, impaired Smith's judgment in 1995, diminished his ability to conform

his conduct to the law and control his impulses, and made him unable to recognize the consequences of his actions. And Dr. Golden's "conservative" estimate of Smith's emotional age was even lower than Dr. Maher's—ten to twelve years old.

But Dr. King disagreed with Dr. Maher's and Dr. Golden's conclusions, and how they arrived at them. For example, Dr. King faulted Dr. Maher's and Dr. Golden's reliance on Ms. Hammock's findings, which were internally "inconsisten[t]." Dr. King also testified that Dr. Golden didn't properly administer the Wechsler Adult Intelligence Test, meaning that, although the results of his test compared to Dr. Golden's appeared similar, they were not "basically the same." Dr. King also disagreed with Dr. Golden's reliance on the Rorschach ink blot test. That test, in Dr. King's view, wasn't a valid or reliable one for assessing emotional distress, brain dysfunction, post-traumatic stress disorder, depression, or polysubstance abuse. And he thought Dr. Golden didn't even administer it properly.

Based on Dr. King's own evaluation of Smith, and unlike Dr. Maher and Dr. Golden, he "found no real evidence for any kind of focal brain damage or anything like that by history, by [Smith's] reports, or by [Smith's] test data," expressly "disagree[ing]" with any diagnosis of frontal or temporal lobe damage. Instead of viewing Smith's brain functioning as "borderline" like Dr. Golden, Dr. King opined that Smith "functions in the low-average to high-borderline range of intellectual ability." Dr. King went on to testify, unlike Dr. Maher, that Smith didn't suffer from post-traumatic

stress disorder either in the present or in 1995. And neither Smith's substance abuse nor any other impairment, Dr. King concluded, made him unable to appreciate the wrongfulness of murdering Ms. Brooks, emotionally immature to the extent the other doctors opined, or in extreme emotional distress. Because Dr. King disagreed with Dr. Maher's and Dr. Golden's evaluation methodologies, on whether Smith's brain functioning was impaired by damage or a mental disorder, and on whether the alleged impairments impacted Smith's mental state at the time of the crime, it wasn't unreasonable for the state appellate court to find that Dr. King's testimony largely controverted Dr. Maher's and Dr. Golden's. *Cf. Pye*, 50 F.4th at 1050 (concluding it wasn't clearly and convincingly wrong for the state habeas court to find that expert mental-health testimony was "conflicting" where the petitioner's expert testified there was frontal-lobe impairment and brain damage, but the state's expert (Dr. King) opined there was no frontal-lobe impairment and the other expert's tests "weren't sophisticated enough").

Smith resists our conclusion. He acknowledges "[c]ertain specific diagnoses were disputed" by Dr. King, but he maintains that there were still "numerous areas of *agreement*" among the experts, like on the facts that Smith had at least some type of learning disability and auditory processing deficits, had been exposed to abuse, and was at least somewhat immature for an eighteen-year-old in 1995. But the fact that the experts agreed on *some* things doesn't render the state appellate court's "*large*[ly]" controverted finding unreasonable. *See Smith*, 122 So. 3d at 238. A fairminded jurist could find that there was at least more disagreement between

Dr. King and Smith's experts than there was common ground. *Cf. Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1258-59 (11th Cir. 2012) (explaining that "largely" means "chiefly," "mostly," or "more . . . than not").

### C. The State Appellate Court Didn't Unreasonably Apply Strickland by Determining Smith's Largely Controverted Mental Health Testimony Wasn't Substantially Likely to Make a Difference

Because the state appellate court didn't unreasonably find that the mental health testimony was largely controverted, we must apply AEDPA deference to its overall no-prejudice determination—that, considering the significant aggravating circumstances of Smith's murder, "presenting evidence of Smith's mental health, which was in large part disputed by [Dr. King], . . . would ha[ve] had no impact on the result[] in the penalty phase." *Smith*, 122 So. 3d at 239. This determination wasn't unreasonable.

*Pye* illustrates why. There, the state habeas court determined the petitioner failed to show *Strickland* prejudice from his trial counsel's failure to investigate his mental health because it "credited the testimony of the [s]tate's expert that [the petitioner] was not as impaired as his [expert] witnesses suggested." *Pye*, 50 F.4th at 1032. We concluded that the state habeas court's no-prejudice determination wasn't an unreasonable application of *Strickland*. *See id.* at 1050–52. "There is no per se rule that the failure to present evidence of a defendant's cognitive defects at sentencing is prejudicial for purposes of the *Strickland* ineffective-assistance

analysis," *id.* at 1051, and the petitioner's expert mental-health testimony wasn't credible because it conflicted with the state's expert's testimony, *id.* at 1050.  Even putting aside the credibility problem, we explained that a fairminded jurist could still determine there was no reasonable probability of a different result because: (1) "[the petitioner] had sufficient mental faculties to plan a robbery, lead two fellow co-defendants in the kidnapping, rape, and murder of his former girlfriend, attempt to avoid detection by authorities through disposal of the murder weapon and accessories, and fabricate an alternative sequence of events," *id.* (cleaned up); (2) the aggravating circumstances were significant, *id.* at 1048–50; and (3) "we have held that the indication of brain damage can often hurt the defense as much or more than it can help," *id.* at 1052 (cleaned up) (quoting *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1329 (11th Cir. 2013) (en banc)).

Here, the state appellate court found—and we must presume to be true, *see* 28 U.S.C. § 2254(e)(1)—that the testimony of Smith's mental-health experts wasn't credible because it was largely controverted by Dr. King's.  Because the testimony wasn't credible over Dr. King's conflicting testimony, "[i]t would . . . strain reason to conclude that [Smith's] doctors' testimony would have had much impact" on either the jury's or the state trial court's weighing of aggravating and mitigating circumstances. *Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227, 1249 (11th Cir. 2009) (concluding the state habeas court's no-prejudice determination wasn't unreasonable where the petitioner's expert mental-health testimony was "largely controverted" by the state's

expert); *see also Pye*, 50 F.4th at 1050; *cf. Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1314, 1317 (11th Cir. 2016) (explaining that the petitioner's expert mental-health testimony had "limited mitigating value" where the state habeas court credited the state expert's conflicting testimony); *Ferguson v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 1315, 1340–41 (11th Cir. 2013) (similar).

Even if Smith's expert testimony wasn't largely controverted by Dr. King's testimony, "the jury could well have been unmoved even if [Smith's trial counsel] . . . presented an expert's testimony about [his] cognitive defects" for two reasons. *Pye*, 50 F.4th at 1050. First, Smith's choice to murder Ms. Brooks was deliberate, not an impulsive one made in the spur of the moment. He had warned Ms. Brooks that he'd kill her if she ever left him, "always" threatened her with a gun "whenever" they argued about their relationship, and worked with his cousins to abduct her once he decided to make good on his threats.

Smith also had "sufficient mental faculties" to "lead" his cousins every step of the way, and to consider how the three men could avoid detection. *See id.* (cleaned up). For example, he directed his cousins to drive to a secluded dirt road, told Sanjay to stand back before shooting Ms. Brooks, moved Ms. Brooks's body away from the road and sought gas to burn her so that nobody would find her, and refused to take her to a hospital after she said she'd reveal he was the shooter. Then he and his cousins drove around for miles plotting where to finish her and leave the body, telling his cousins to go to a relative's house because "grass was

around there and saying you've got to walk to get back there." He knew to ditch that plan once he saw the house's lights were on. And, besides trying to hide Ms. Brooks's body in a roll of old carpet, he went out of his way to concoct a story about Ms. Brooks leaving his house in a maroon or red car—instructing Sanjay to relay the false story if anybody asked and calling Ms. Brooks's mother to deliver the fake story before repeating it to Ms. Brooks's friend and the cops. *Cf. id.* (noting how the petitioner "fabricate[d] an alternative sequence of events").

Second, the jury could well have been unmoved by the mitigating evidence (including mental health and IQ evidence) in light of the significant aggravating circumstances found by the state trial court. The state trial court found two aggravating factors— (1) Smith committed murder while engaged in the act of kidnapping in the first degree; and (2) the murder was particularly heinous, atrocious, and cruel when compared to other offenses—that "carr[ied] great weight." Not only was Smith's murder of Ms. Brooks "deliberately and intentionally planned and carried out," but he passed on a chance to save her upon discovering she survived his gunshots. Then he had his cousins drive Ms. Brooks around for miles while Smith—in Ms. Brooks's conscious presence—discussed where to kill her and leave her body. And, after walking her a hundred yards down a dark dirt road at gunpoint, Smith tried to suffocate her with a trash bag before dousing her in gasoline and burning her alive in a dump site.

For these reasons, the state appellate court's determination that Smith's expert mental-health testimony wasn't substantially likely to change the result of his penalty phase if presented wasn't unreasonable.

In response, Smith argues that the mental health evidence that his trial counsel failed to investigate was similar to that in *Porter v. McCollum*, 558 U.S. 30 (2009), *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Williams v. Taylor*, 529 U.S. 362 (2000). He also compares his trial counsel's allegedly deficient mitigation investigation to that in several of our cases, primarily *DeBruce v. Commissioner, Alabama Department of Corrections*, 758 F.3d 1263 (11th Cir. 2014), *Johnson v. Secretary, DOC*, 643 F.3d 907 (11th Cir. 2011), *Cooper v. Secretary, Department of Corrections*, 646 F.3d 1328 (11th Cir. 2011), *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011), and *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008).

Although the Supreme Court concluded in *Porter* that trial counsel's deficient investigation of mental health evidence was prejudicial under *Strickland*, that case does not establish that the state appellate court's determination here was unreasonable. In *Porter*, the mental health evidence was "largely unrebutted." *Pye*, 50 F.4th at 1051 (citing *Porter*, 558 U.S. at 36). And as Smith acknowledges, the mitigation evidence in *DeBruce*, *Johnson*, *Cooper*, *Ferrell*, and *Allen*, like in *Porter*, was for the most part "[u]ncontested." The state appellate court here found the opposite—that Smith's mental health evidence was largely controverted by Dr. King's more credible testimony. *See Smith*, 122 So. 3d at 238.

As for *Rompilla* and *Williams*, those two cases are even further off the mark because they "offer no guidance" on the question we must answer: "whether [the] state [appellate] court has unreasonably determined that prejudice is lacking." *Pye*, 50 F.4th at 1056 (quoting *Cullen*, 563 U.S. at 202). That's because *Rompilla* and *Williams* "did not apply AEDPA deference to the question of prejudice." *Id.* (quoting *Cullen*, 563 U.S. at 202). Nor did *Cooper* or *Johnson* apply AEDPA deference to the prejudice prong. *See Cooper*, 646 F.3d at 1353, 1356; *Johnson*, 643 F.3d at 935. So those cases, like *Rompilla* and *Williams*, offer no guidance on whether the state appellate court unreasonably determined prejudice is lacking. *See Pye*, 50 F.4th at 1056.

## IV.    CONCLUSION

Smith has not shown that the state appellate court's decision—determining that he was not prejudiced under *Strickland* by trial counsel's failure to investigate evidence of his mental health problems—was based on an unreasonable determination of the facts or was an unreasonable application of clearly established federal law. Thus, the district court properly denied Smith's federal habeas petition.

**AFFIRMED.**